772 F.2d 231
 54 USLW 2183, Fed. Sec. L. Rep. P 92,290
 Irving STARKMAN, M.D., Trustee of the Irving Starkman, M.D.,
S.C. Defined Benefit Pension Fund and Trust, on
behalf of himself and all others
similarly situated, Plaintiff-Appellant,
v.
MARATHON OIL COMPANY, an Ohio corporation, H.D. Hoopman,
C.H. Barre, V.G. Beghini, H.H. Hering, and W.E.
Swales, Defendants-Appellees.
 No. 84-3215.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 22, 1985.
Decided Sept. 13, 1985.
 
 Lawrence Walner, Lawrence Walner & Associates, Chicago, Ill., Larry A. Temin, Strauss, Troy & Ruehlmann Co., Cincinnati, Ohio, Edward Slovick, argued, James Gordon, Chicago, Ill., for plaintiff-appellant.
 Murray S. Monroe, Cincinnati, Ohio, John M. Newman, John W. Edwards, III, Robert R. Weller, John L. Strauch, argued, Cleveland, Ohio, James T. Griffin, Michael P. Mullen, William J. Raleigh, Chicago, Ill., for defendants-appellees.
 Before MERRITT and KENNEDY, Circuit Judges, and PECK, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 Like Radol v. Thomas, 772 F.2d 244 (6th Cir.1985), this action arises out of U.S. Steel's November, 1981 acquisition and eventual merger with Marathon Oil Company. The plaintiff here, Irving Starkman, was a Marathon shareholder until selling his shares on the open market for $78 per share on November 18, 1981, the day before U.S. Steel's tender offer for 51% of Marathon's outstanding shares at $125 per share was announced.[1] On October 31, 1981, Mobil Oil had initiated its takeover bid for Marathon, a bid which Marathon actively resisted by urging its rejection by Marathon shareholders and by seeking and eventually finding a "white knight" or alternative, friendly merger partner-tender offeror, U.S. Steel. Starkman claims that Marathon's board violated Rule 10b-5 and its fiduciary duty to him as a Marathon shareholder by failing to disclose various items of "soft" information--information of less certainty than hard facts--in its public statements to shareholders during the period after Mobil's hostile tender offer and prior to Steel's friendly tender offer. In particular, he says that Marathon should have told shareholders that negotiations were underway with U.S. Steel prior to the consummation of those negotiations in an agreement, and that internal and externally-prepared asset appraisals and five-year earnings and cash flow projections should have been disclosed to shareholders so that they could make a fully informed choice whether to sell their shares or gamble on receiving a higher price in a possible Steel-Marathon merger.
 
 
 2
 The District Court granted summary judgment for Marathon, finding that these items of soft information had either been sufficiently disclosed or were not required to be disclosed because their nondisclosure did not render materially misleading Marathon's other affirmative public statements. For the reasons stated below, we affirm the judgment of the district Court.
 
 I. BACKGROUND
 
 3
 We have discussed the background and structure of U.S. Steel's acquisition of Marathon Oil at some length in Radol v. Thomas, 772 F.2d 244 (6th Cir.1985), and our attention here will therefore be focused on the facts which are especially relevant to Starkman's Rule 10b-5 claims.[2]
 
 
 4
 In the summer of 1981, Marathon was among a number of oil companies considered to be prime takeover targets. In this atmosphere, Marathon's top level management began preparations against a hostile takeover bid. Harold Hoopman, Marathon's president and chief executive officer, instructed the company's vice presidents to compile a catalog of assets. This document, referred to as the "Strong Report" or "internal asset evaluation," estimated the value of Marathon's transportation, refining and marketing assets, its other equipment and structures, and the value of proven, probable, and potential oil reserves as well as exploratory acreage. Hoopman and John Strong, who was responsible for combining materials received from various divisions into the final report, both testified that the Strong report was viewed as a "selling document" which placed optimistic values on Marathon's oil and gas reserves so as to attract the interest of prospective buyers and ensure that Marathon could either ward off an attempt to capture Marathon at a bargain price or obtain the best offer available.
 
 
 5
 In estimating proven, probable, and potential reserves and exploratory acreage, the Strong Report was based on information that was not available to the general public, for example in annual reports, because only the value of proven reserves was normally included in such public documents. The Strong Report defined proven reserves as those actually producing, probable reserves as reserves for properties where some production had been established and additional production was likely, and potential reserves as reserves for properties where production had not yet been established but where geologic evidence supported wildcat drilling.[3] These reserves were valued using a discounted cash flow methodology, under which the present value of oil reserves is calculated by summing risk discounted expected net revenues from the particular field over the life of the field, and then discounted into present value by dividing by an estimated interest rate. This valuation method, a standard procedure for determining the cash value of oil and gas properties, required projections of price and cost conditions prevailing as far as 20 years into the future. For example, the Strong Report assumed that the rate of increase in oil prices would average over 9% per year from 1980-1990.
 
 
 6
 Using this methodology, the Strong Report valued Marathon's net assets at between $19 billion and $16 billion (depending on which set of interest rates was used to discount back to present value), a per share value of between $323 and $276. The value of oil and gas reserves made up $14 billion of the $19 billion estimate and $11.5 billion of the $16 billion estimate. A similar report using identical methodology was prepared in mid-July 1981 by the investment banking firm of First Boston, which had been hired by Marathon to assist in preparing for potential takeover bids. The First Boston Report was based only upon proven and probable oil reserves and was also intended to be used as a "presentation piece" to avoid a takeover or maximize the price obtained in a takeover. It placed Marathon's value at between $188 and $225 per share.
 
 
 7
 Some perspective on the values arrived at in the Strong and First Boston reports can be gained from other, publicly available appraisals of Marathon's assets prepared during 1981. The Herold Oil Industry Comparative Appraisal placed Marathon's appraised value at $199 per share, and two other reports by securities analysts said Marathon had an appraised value of between $200 and $210 per share.[4]
 
 
 8
 Marathon's market value, however, was well below these appraised values. On October 29, 1981, Marathon closed at $63.75 per share. The next day, Mobil Oil announced its tender offer to purchase up to approximately 68% of outstanding Marathon common stock for $85 per share in cash. Mobil proposed to follow the tender offer with a going private or freezeout merger in which the remaining shareholders of Marathon would receive sinking fund debentures worth approximately $85 per share.
 
 
 9
 On October 31, 1981, Marathon's board of directors met in emergency session and unanimously decided that the Mobil offer was "grossly inadequate" and approved a vigorous campaign to persuade Marathon shareholders not to tender to Mobil, and to simultaneously seek a "white knight." On November 11 and 12, Marathon's Board made public statements to the shareholders recommending rejection of Mobil's bid as "grossly inadequate" and against the best interests of the company. We explore these statements in more detail below, as they are a primary focus of Starkman's claims of inadequate disclosure. However, at the time these statements to shareholders were made, Marathon representatives had already contacted all of the 30 to 35 companies who could possibly undertake an acquisition topping Mobil's bid, and, in particular, had begun negotiations with U.S. Steel on November 10. The Strong and First Boston reports were given to Steel on that same day, on the condition that they be kept confidential, and on November 12, Marathon's vice president for finance delivered five-year earnings forecasts and cash flow projections to Steel in Pittsburgh.
 
 
 10
 On November 17, Hoopman and David Roderick, Steel's president, reached agreement on the terms of Steel's purchase of Marathon, and, after Board approval, an agreement was signed on November 18, 1981. Under the terms of the agreement, Steel would make a tender offer for up to 31 million shares (about 51%) of Marathon stock for $125 per share in cash, to be followed by a merger proposal in which each remaining Marathon shareholder would receive one $100 face value, 12 year, 12 1/2 per cent guaranteed note per share of common stock. On November 19, Steel mailed its tender offer to Marathon shareholders, and Hoopman sent a letter to Marathon shareholders describing the two-stage deal and stating the opinion of Marathon's Board that the agreement was fair to Marathon shareholders. Steel's offer was successful, with over 91% of the outstanding shares tendered, and the second stage freezeout merger was approved by a two-thirds majority of the remaining shareholders in February, 1982.
 
 
 11
 II. MARATHON'S PUBLIC STATEMENTS AND DISPOSITION BELOW
 
 
 12
 There are three public statements by Marathon management at issue here. First, Marathon's November 11, 1981, press release, which states, in pertinent part, that:
 
 
 13
 Our Board of Directors has determined that Mobil Corporation's unsolicited tender offer is grossly inadequate. The offer is not in the best interests of Marathon Oil or its shareholders. It doesn't reflect current asset values and it doesn't permit the long-term investor the opportunity to participate in the potential values that have been developed.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 We plan to do everything we possibly can to defeat this offer. We are determined to stay independent.
 
 
 17
 A. 187.
 
 
 18
 The next day, as required by Rule 14e-2, 17 C.F.R. Sec. 240.14e-2 (1984), Marathon mailed a letter to its shareholders stating its position regarding Mobil's tender offer. The letter urged rejection of the offer, stating that Marathon's Board was "convinced that the Mobil offer is grossly inadequate and does not represent the real values of the assets underlying your investment in Marathon." A. 182. The letter described a number of alternative courses of action that were being considered by the Board, including "repurchase of Marathon shares, acquisition of all or part of another company, a business combination with another company, (and) the declaration of an extra ordinary dividend and a complete or partial liquidation of the Company," id., and concluded by again urging rejection of Mobil's attempt to "seize control of Marathon's assets at a fraction of their value," and stating that "[w]e are convinced that you and our other shareholders would be well served if Marathon remains independent." Id.
 
 
 19
 Attached to this letter was a copy of Marathon's Schedule 14D-9, filed pursuant to Rule 14d-9, 17 C.F.R. Sec. 240.14d-9, in which the board informed the SEC that it had recommended rejection of the Mobil offer as "grossly inadequate." Item 4(b)(iv) of Marathon's Schedule 14D-9 listed as a factor supporting this recommendation the board's belief that based on current economic and market factors, "this is an extremely inopportune time to sell the Company and, in any event, that its shareholders would be better served if the Company were to remain independent." A. 92. Item 7 of this same schedule described "Certain Negotiations and Transactions" by Marathon:
 
 
 20
 At a meeting of the Board of Directors held on October 31, 1981, the Board considered and reviewed the feasibility and desirability of exploring and investigating certain types of possible transactions, including, without limitation, repurchases of Company Common Shares, the public or private sale of equity or other securities of the Company, a business combination between the Company and another company, the acquisition of a significant interest in or the entire Company or of one or more of its significant business segments by another company, a joint venture between the Company and one or more other companies, the acquisition by the Company of all or part of the business of another Company, a complete or partial liquidation of the Company or the declaration of an extraordinary dividend. After considerable discussion, the Board resolved that it was desirable and in the best interest of the Company and its shareholders to explore and investigate, with the assistance and advice of First Boston, such transactions, although the Board noted that the initiation or continuation of such activities may be dependent upon Mobil's future actions with respect to the Mobil Offer. There can be no assurance that these activities will result in any transaction being recommended to the Board of Directors or that any transaction which is recommended will be authorized or consummated.
 
 
 21
 A. 96.
 
 
 22
 Starkman argues that the failure of any of these communications to disclose the Strong and First Boston reports and the five-year earnings and cash flow projections constituted an omission of material facts which rendered these communications materially misleading, and that Marathon not only failed to adequately disclose its search for a white knight and its negotiations with Steel but actually gave the false impression that the Board was endeavoring to preserve Marathon as an independent entity. He argues that the Strong and First Boston reports, the five-year cash and earnings projections, and the fact of ongoing negotiations with U.S. Steel were all material facts because knowledge of them would have affected a reasonable shareholder's evaluation of the likelihood that Marathon would succeed in negotiating a higher price takeover, and thereby affect such a shareholder's decision to sell his shares. He contends that shareholders were not adequately informed of Marathon management's search for a "white knight" and of the negotiations with Steel, and that failure to disclose more information regarding these negotiations rendered statements suggesting that Marathon might remain independent materially misleading. Similarly, Starkman contends that if he had been told of the Strong and First Boston reports and the five-year earnings and cash flow projections, and also that Marathon management was using these figures in seeking an alternative bidder, then he would have anticipated a much higher bid than he did, and that failure to release this information rendered materially misleading the affirmative statements Marathon did make.
 
 
 23
 In his brief on this appeal, Starkman has repeatedly mischaracterized the decision of the District Court as holding that none of the information Starkman contends should have been disclosed was material. To understand the District Court's holding in this case, it is important to note at the outset that in Radol v. Thomas, 772 F.2d 244 No. 83-3598 (6th Cir.1985), the plaintiffs claimed that the same asset appraisals at issue here should have been disclosed by Steel in its tender offer and by Marathon in its statements recommending that shareholders accept Steel's offer. Judge Rubin presided over both the present suit and Radol, and in Radol he denied the defendant's motion for summary judgment on the issue of whether the asset appraisals should have been disclosed at the time of Steel's tender offer on the ground that the reports were not, as a matter of law, immaterial, and he sent the materiality of these reports to the jury. See Radol v. Thomas, 556 F.Supp. 586, 594 (S.D.Ohio 1983).
 
 
 24
 In granting summary judgment for Marathon in the present action, however, Judge Rubin found that the net asset values stated in the Strong and First Boston reports were perfectly consistent with Marathon's repeated public assertion that Mobil's bid was "grossly inadequate" in light of the true value of Marathon's assets, and that disclosure of the reports was not required under Rule 10b-5 because "disclosure of information which is consistent with other statements made is obviously not necessary in order to make those statements not misleading. Such disclosure would simply reinforce, rather than correct or modify, the statements made." A. 16. As to the claim that nondisclosure of the reports rendered misleading Marathon's statements that the best result would be for the company to remain independent, the District Court said that these statements were not misleading when placed in the context of the repeated assertion that Mobil's offer was "grossly inadequate" and that alternatives including merger into another company were under consideration. A. 17.
 
 
 25
 The District Court summarily disposed of the claim that the five-year earnings and cash flow projections should have been disclosed, concluding that disclosure of such information is simply not required under Marsh v. Armada Corp., 533 F.2d 978, 986-87 (6th Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977), and Arber v. Essex Wire Corp., 490 F.2d 414, 421 (6th Cir.1974), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974). A. 18.
 
 
 26
 As to disclosure of the negotiations with Steel, the District Court cited Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir.1983), and Staffin v. Greenberg, 672 F.2d 1196, 1206 (3d Cir.1982), in ruling that Marathon's 14D-9 disclosure that the acquisition of all or part of another company, or merger with another company, was being considered as an alternative to the Mobil offer sufficed to meet whatever disclosure obligation may have existed. A. 19-20.
 
 III. DISCUSSION
 A. Introduction
 
 27
 Pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), which prohibits the use of any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe," "in connection with the purchase or sale of any security," the SEC promulgated Rule 10b-5, which provides in pertinent part that:
 
 
 28
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...
 
 
 32
 17 C.F.R. Sec. 240.10b-5 (1984).
 
 
 33
 Aptly described as a "judicial oak which has grown from little more than a legislative acorn," Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975), Rule 10b-5 has been the source of a wide-ranging federal common law of securities fraud, clearly applicable to the tender offer context, provided that, as here, there has been a purchase or sale of a security. See 3 L. Loss, Securities Regulation 1445 (2d ed. 1961).
 
 
 34
 Despite occasional suggestions by commentators, see, e.g., Bauman, Rule 10b-5 and the Corporation's Affirmative Duty to Disclose, 67 Geo.L.J. 935 (1979), and the courts, Zweig v. Hearst Corp., 594 F.2d 1261, 1266 (9th Cir.1979), that Rule 10b-5 imposes an affirmative obligation on the corporation to disclose all material information regardless of whether the corporation has made any other statements, the established view is that a "duty to speak" must exist before the disclosure of material facts is required under Rule 10b-5. See Flynn v. Bass Brothers Enterprises, Inc., 744 F.2d 978, 984 (3d Cir.1984) (citing Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); Staffin v. Greenberg, 672 F.2d 1196, 1202 (3d Cir.1982)). Provided that such a duty to speak exists, a further limitation on the duty to disclose is imposed by the requirement that only misstatements of material facts and omissions of material facts necessary to make other required statements not misleading are prohibited by Rule 10b-5. The Supreme Court's definition of "material" in the context of an alleged violation of Rule 14a-9, governing disclosure requirements in proxy statements, has been adopted for cases involving Rule 10b-5 in the tender offer context. Flynn v. Bass Brothers Enterprises, 744 F.2d at 985; Staffin v. Greenberg, 672 F.2d at 1205; Panter v. Marshall Field & Co., 646 F.2d 271, 282 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). That definition reads as follows:
 
 
 35
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with [Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) ] general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 36
 TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).
 
 
 37
 In structuring the disclosure duties of a tender offer target, we begin therefore with the basic proposition that only material facts--those substantially likely to affect the deliberations of the reasonable shareholder--must be disclosed, and then only if the nondisclosure of the particular material facts would make misleading the affirmative statements otherwise required by the federal securities laws and SEC regulations.
 
 
 38
 Our adherence to this basic proposition ensures that target management's disclosure obligations will strike the correct balance between the competing costs and benefits of disclosure. The benefits of disclosure in ensuring that shareholders who are suddenly faced with a tender offer will not be forced to respond without adequate information are clearly recognized in Section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e), which somewhat broadens the reach of Rule 10b-5 to statements made "in connection with any tender offer" and which provides the statutory authority for SEC rules imposing affirmative disclosure obligations on tender offer targets.[5] On the other hand, tender offers remain essentially contests in which participants on both sides act under the "stresses of the marketplace," and "[p]robably there will no more be a perfect tender offer than a perfect trial." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir.1969) (Friendly, J.). Under these conditions, imposing an "unrealistic requirement of laboratory conditions," id., would place target management under the highly unpredictable threat of huge liability for the failure to disclose, perhaps inducing the disclosure of mountains of documents and hourly reports on negotiations with potential tender offerors, a deluge of information which would be more likely to confuse than guide the reasonable lay shareholder and which could interfere with the negotiation of a higher tender offer and actually reduce the likelihood that a shareholder will benefit from a successful tender offer at a premium over the market. It is with these competing considerations in mind that we turn to the particular disclosure claims made here.
 
 
 39
 B. Assets Appraisals and Earnings Projections
 
 
 40
 We first address Starkman's contention that Marathon should have disclosed the Strong and First Boston reports and the five-year earnings projections and forecasts given to Steel. Under the authority of Section 14(e) of the Williams Act, the SEC requires a tender offer target to make two affirmative statements regarding an offer. First, Rule 14e-2 requires that the target company mail or publish a statement to its shareholders within 10 days of the tender offer stating its position (or stating it cannot take a position) and giving reasons for the position. Under Rule 14d-9, a Schedule 14D-9 must be filed with the SEC "as soon as practicable" after the recommendation letter is sent to shareholders. The information to be included in the Schedule 14D-9 is described in 17 C.F.R. Sec. 14d-101. Significantly, although Item 4 of the Schedule 14D-9 is to contain a statement of the reasons for the target's position with respect to the offer, and Item 8 requires disclosure of any additional information as "may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading" neither the shareholder recommendation letter nor the Schedule 14D-9 must contain internal asset appraisals, appraisals done by outside consultants such as First Boston, or earnings and cash flow projections.
 
 
 41
 Since there is no SEC rule specifically requiring the disclosure of this information, we must determine whether Rule 10b-5 requires its disclosure as material information, the nondisclosure of which would render misleading other statements made by Marathon. The starting point in this analysis is the underlying regulatory policy toward disclosure of such information, since regulatory rules reflect careful study of general conditions prevailing in the securities marketplace and provide guidelines upon which corporate officers and directors are entitled to rely.
 
 
 42
 The SEC's policy toward the inclusion of appraised asset valuations, projections and other "soft" information in proxy materials, tender offers and other disclosure documents has undergone a gradual evolution toward allowing the inclusion of such information in some special contexts, provided that the assumptions and hypotheses underlying predicted values are also disclosed.
 
 
 43
 In 1976, future earnings projections were deleted from a list of examples of potentially misleading disclosures in proxy statements in the note which followed Rule 14a-9. See Securities Act Release No. 5699, reprinted in [1975-76 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 80, 461 (1976). And, effective July 30, 1979, the SEC adopted a "safe harbor" rule for projections, under which a statement containing a projection of revenues and earnings would not be considered to be a materially misleading misstatement or omission for purposes of liability under the federal securities laws provided the statement was prepared with a reasonable basis and was disclosed in good faith. See Securities Act Release No. 6084 reprinted in [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 82,117, at 81,939 (June 25, 1979).
 
 
 44
 With respect to asset appraisals, Rule 13e-3, 17 C.F.R. Sec. 240.13e-3, requires disclosure of the information called for by Items 7, 8, and 9 of Schedule 13E-3, 17 C.F.R. Sec. 240.13e-100, in the context of freezeout mergers. Item 8 of Schedule 13E-3 requires disclosure of factors important in determining the fairness of such a transaction to unaffiliated shareholders, and these factors include liquidation value; Item 9 of that same schedule says that a summary of any outside appraisal must be furnished, with the summary including a discussion of the procedures and methods of arriving at the findings and recommendations of the appraisal. However, a 1979 SEC-proposed amendment under which an issuer would have to disclose any projection given to an appraisal furnisher was never adopted, see 2 Fed.Sec.L.Rep. (CCH) p 23-706, at 17,245-21 through 21A, and, even more importantly, in Radol v. Thomas, 772 F.2d 244 No. 83-3598, (6th Cir.1985), we have rejected the position that SEC rules regarding freezeout mergers and proxies should determine the disclosure obligations of target management in the first stage of a two-tier tender offer.[6]
 
 
 45
 Finally, we note that until March, 1982, Regulation S-K, the source for disclosure obligations in annual reports, registration documents and other documents that must be filed with the SEC, provided in Instruction 2 to Item 2(b) that estimates of probable or possible oil and gas reserves should not be disclosed in any document publicly filed with the SEC. See Securities Act Release No. 6008, reprinted in [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81, 768, at 81,104 (Dec. 19, 1978). The underlying reason was that "estimates of probable or possible reserves and any value thereof are not sufficiently reliable to be included ... and may be misleading to investors." Id. In March, 1982, well after Steel's tender offer, Item 102 of Regulation S-K was amended to allow disclosure of "estimated" as well as proved reserves where such estimates have previously been provided to a person who is offering to acquire or merge with the subject company, see Securities Act Release No. 6383, reprinted in [1937-1982 Accounting Series Release Transfer Binder] Fed.Sec.L.Rep. (CCH) p 72,328, at 63,003 (March 3, 1982). The Strong and First Boston reports contain estimates of probable and possible reserves, and the disclosure of this information was actually prohibited at the time of Steel's tender offer, and only permitted since that time.
 
 
 46
 Thus, at the time of Steel's tender offer, the SEC did not require disclosure of earnings projections in any context, and required disclosure of asset appraisals, in summary form, only in the special context of freeze-out mergers, which differs markedly from the setting of a first-stage tender offer. Although the SEC allowed disclosure of projections, provided they were prepared on a "reasonable basis" and in "good faith," and also allowed disclosure of similarly supported asset appraisals in some proxy contests, it forbade the disclosure of estimates of probable and potential oil and gas reserves, a major component of the Strong and First Boston appraisals. Absent compelling authority to the contrary, we are reluctant to impose liability on Marathon for failing to disclose asset appraisals based on hypothetical valuations which the SEC did not then permit to be disclosed in most contexts, particularly since Section 23(a) of the Securities and Exchange Act, 15 U.S.C. Sec. 78w(a)(1) provides that no liability under the federal securities laws shall be imposed for "any act done or omitted in good faith conformity with a rule, regulation, or order of the Commission." See Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1292-94 (2d Cir.1973) (refusing, per Friendly, J., to impose liability on the basis of an ex-post modification in SEC policy for non-disclosure in 1963 merger proxy statement of asset appraisals when it was an "article of faith" among securities lawyers in 1963 that such appraisals could not be included in a proxy statement.)
 
 
 47
 Rather than suggesting a duty to disclose the Strong and First Boston reports, however, our cases firmly establish the rule that soft information such as asset appraisals and projections must be disclosed only if the reported values are virtually as certain as hard facts.
 
 
 48
 This Court has recently held that a target's failure to disclose an appraisal based on five-year cash flow and earnings projections and intended to be used as a selling document in ongoing merger discussions did not violate Rule 10b-5. Biechele v. Cedar Point, Inc., 747 F.2d 209 (6th Cir.1984). Chief Judge Lively's opinion for the court reasoned that the report was a "selling document" which "contained projections and speculative assumptions which were little more than predictions of future business success," and valuations based on the replacement cost of assets which could be misleading to shareholders, since they varied from balance sheet information prepared according to accepted accounting principles. Id. at 216. Similarly, in James v. Gerber Products Co., 587 F.2d 324, 327 (6th Cir.1978), we held that the failure to disclose interim earnings reports in connection with a shareholder's sale of stock back to the issuing company did not violate Rule 10b-5, because "such sales figures, projections, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." And in Arber v. Essex Wire Corp., 490 F.2d 414, 421 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974), another case involving a corporate stock repurchase, then Judge McCree said that while a fixed plan of future corporate activity might, under some circumstances, be viewed as a material fact, Section 10(b) and Rule 10b-5 did not require a corporate insider to disclose his educated guesses or predictions, and "[i]n short, the law mandates disclosure only of existing material facts. It does not require an insider to volunteer any economic forecast." See also Marsh v. Armada Corp., 533 F.2d 978, 987 (6th Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977) (failure to make a projection of future earnings in freeze-out merger proxy statement not actionable under Rule 10b-5).
 
 
 49
 Our cases fully support a rule under which a tender offer target must disclose projections and asset appraisals based upon predictions regarding future economic and corporate events only if the predictions underlying the appraisal or projection are substantially certain to hold. An example is when the predictions in fact state a fixed plan of corporate activity. If a target chooses to disclose projections and appraisals which do not rise to this level of certainty, then it must also inform the shareholders as to the basis for and limitations on the projected realizable values.[7]
 
 
 50
 The Third Circuit has enunciated a different test, under which "courts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis, by weighing the potential aid such information will give the shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note." Flynn v. Bass Brothers Enterprises, 744 F.2d at 988. The court listed several factors the courts have considered in determining the reliability of soft information, including the qualifications of those who prepared the appraisal, the degree of certainty of the data on which it was based, and the purpose for which it was prepared. 744 F.2d at 986, 988 (compiling cases); see also Panter v. Marshall Field, 646 F.2d at 292-93.
 
 
 51
 By its very nature, however, this sort of judicial cost-benefit analysis is uncertain and unpredictable, and it moreover neglects the role of the market in providing shareholders with information regarding the target's value through competing tender offers. Our approach, which focuses on the certainty of the data underlying the appraisal or projection, ensures that the target company's shareholders will receive all essentially factual information, while preserving the target's discretion to disclose more uncertain information without the threat of liability, provided appropriate qualifications and explanations are made.
 
 
 52
 Under this standard, Marathon plainly had no duty to disclose the Strong and First Boston reports, because these reports contained estimates of the value of probable, potential and unexplored oil and gas reserves which were based on highly speculative assumptions regarding the path of oil and gas prices, recovery rates and the like over a period of thirty to fifty years. Disclosure of such estimated values could well have been misleading without an accompanying mountain of data and explanations. There is no reported case actually holding that disclosure of appraised values of oil and gas reserves is required, and several which agree with our decision that such disclosure is not required.[8]
 
 
 53
 Similarly, Marathon had no duty to disclose the five-year earnings and cash flow projections given to Steel and First Boston. This information does not rise to the level of substantial certainty triggering a duty to disclose. Biechele v. Cedar Point; James v. Gerber Products Corp., both supra.
 
 
 54
 Further, disclosure of the asset appraisals and earnings and cash flow projections was not required in order to ensure that other statements in Marathon's 14D-9 and in its letter recommending rejection of Mobil's bid were not misleading. Marathon stated that Mobil's $85 offer was "grossly inadequate" and disclosure of highly uncertain information indicating that Marathon had a net asset value of over $200 per share would only have supported this statement, and could have actually misled shareholders into thinking that the market would actually support a price of $200 per share.
 
 C.
 
 55
 Starkman's contention that Marathon should have disclosed more information regarding its search for a white knight and its negotiations with Steel are equally without merit. The SEC and the courts have enunciated a firm rule regarding a tender offer target's duty to disclose ongoing negotiations: so long as merger or acquisition discussions are preliminary, general disclosure of the fact that such alternatives are being considered will suffice to adequately inform shareholders; a duty to disclose the possible terms of any transaction and the parties thereto arises only after an agreement in principle, regarding such fundamental terms as price and structure, has been reached. See Item 7 of Schedule 14D-9, 17 C.F.R. Sec. 240.14d-101 (1984); Greenfield v. Heublein, Inc., 742 F.2d 751, 756-57 (3d Cir.1984), cert. denied, --- U.S. ---, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985) (rejecting an "intent to merge" trigger standard); Staffin v. Greenberg, 672 F.2d 1196, 1207 (3d Cir.1982); Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir.1983).[9]
 
 
 56
 The rationale emerging from these cases is that when dealing with complex bargaining which may fail as well as succeed and which may succeed on terms which vary greatly from those originally anticipated, the disclosure of preliminary discussions could very easily mislead shareholders as to the prospects of success, and by making public an impending offer, push the price of the target's stock toward the expected tender price, thereby depriving shareholders of the primary inducement to tender--a premium above market price--and forcing the offeror to abandon its plans or greatly increasing the cost of the offer. See Staffin v. Greenberg, 672 F.2d at 1207.
 
 
 57
 In the instant case, Marathon's shareholder recommendation letter and its Schedule 14D-9 stated that the company was considering a number of alternatives, including a merger with another firm. These statements adequately informed the shareholders of Marathon's plans. Additional statements in these documents to the effect that Marathon's board believed the best result would be for Marathon to remain independent were not misleading when read in their full context, and at most expressed a sincere hope which the board found unrealistic under the pressure of Mobil's offer.
 
 
 58
 Finally, Starkman's claims for fraud and breach of fiduciary duty are completely unsupported by authority in his brief, and were similarly neglected in his arguments below. We therefore affirm and adopt the reasoning of the District Court finding that no claim for fraud has been made out because Marathon did not fail to disclose any information necessary to make its other public statements not misleading, and that the directors' statements, made at a time of extraordinary pressure on the board, comported in all respects with federal law and did not breach a fiduciary duty to Marathon's shareholders.
 
 
 59
 Accordingly, the judgment of the District Court is affirmed.
 
 
 
 [1]
 Although Starkman still styles his case as a class action, the District Court twice denied motions for class determination, and this issue is not before us on appeal
 
 
 [2]
 Judge Rubin disposed of this suit on summary judgment after the trial in Radol v. Thomas. Although very limited discovery was allowed prior to the summary judgment order, Starkman moved to supplement the record on this appeal, with a large amount of evidence taken in Radol v. Thomas, including the Strong and First Boston reports, Doc. 91, and this motion was unopposed by Marathon and was granted. Doc. 98. All the facts discussed in this section are properly in the record in this appeal as supplemented, but references to their physical location in the Radol v. Thomas appellate record will be explicitly noted where appropriate. Otherwise, "A" denotes the appendix in this appeal
 
 
 [3]
 These definitions appear at pages 1160-1162 in the Appendix in Radol v. Thomas
 
 
 [4]
 See Radol v. Thomas appendix at 2585, 2590
 
 
 [5]
 Section 14(e) provides, in part, that:
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer....
 
 
 [6]
 In addition, while the note to Rule 14a-9 lists "predictions as to specific future market values" as a potentially misleading proxy statement disclosure, the SEC in 1980 authorized disclosure of good faith appraisals made on a reasonable basis in proxy contests in which a principal issue is the disposition of the issuer's assets, provided that the valuations are accompanied by "disclosure which facilitates shareholders' understanding of the basis for and limitations on the projected realizable values." Exchange Act Release No. 34-16833, reprinted in 3 Fed.Sec.L.Rep. (CCH) p 24,117 (May 23, 1980). This same release cautioned, however, that where "valuations are so qualified and subject to material limitations and contingencies, inclusion in proxy soliciting material of specific realizable values may be unreasonable." 3 Fed.Sec.L.Rep. (CCH) at 17, 621-13
 
 
 [7]
 We note that this rule is fully consistent with the recent statement by the SEC Advisory Committee on Tender Offers that "current disclosures of projections and valuations given to a bidder by a target company are essentially meaningless and can be misleading without disclosure of the underlying assumptions," and with that Committee's recommendation that "[w]here the bidder discloses projections or asset valuations to target company shareholders, it must include disclosure of the principal supporting assumptions provided to the bidder by the target." See SEC Advisory Committee on Tender Offers, Report of Recommendations, at 29 (July 8, 1983)
 
 
 [8]
 See, e.g., Sunray v. DX Oil Co. v. Helmerich & Payne, Inc., 398 F.2d 447, 450-51 (10th Cir.1968) ("any statement concerning oil reserves other than in the category of 'proved' could certainly be misleading to any investor other than one who is an expert in the industry"); Caspary v. Louisiana Land and Exploration Co., 579 F.Supp. 1105 (S.D.N.Y.1983), aff'd, 725 F.2d 189 (2d Cir.1984) (no duty to disclose internal projections regarding oil recovery rates and exploration costs); Bradshaw v. Jenkins, [1983-84 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 99,719 (W.D.Wash. March 9, 1984) (no duty to disclose consultant's estimated value of energy loan portfolio)
 
 
 [9]
 Greenfield v. Heublein also held that Hublein's voluntary statement in response to a New York Stock Exchange inquiry that it knew of no reason for an unusual increase in trading activity in its stock when in fact it knew of ongoing merger negotiations was not false or misleading because the merger negotiations had not been formally disclosed and there was no indication that the information had been leaked or that insider trading had occurred. 742 F.2d at 759. This holding is directly contrary to the position taken by the SEC in that case as amicus that while a company may respond with "no comment" to stock exchange inquiries regarding unusual market activity, it may not state that no corporate development accounts for the stock activity when in fact it knows that merger negotiations are under way. This related position has not altered the Commission's longstanding policy that negotiations need not otherwise be disclosed unless an agreement in principle has been reached