Gino PITTIGLIO, Stuart D. Wish, Milton E. Freeman, Rhoda Lee Mackenzie, Michelle A. Kilgore, and Michael Vickrey, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MICHIGAN NATIONAL CORPORATION, Robert J. Mylod, Douglas Ebert, and Joseph Whiteside, Defendants.

No. 95 cv 70647.

United States District Court, E.D. Michigan. Southern Division.

Nov. 30, 1995.

Elizabeth N. McKenna, McKenna & Miller, Southfield, MI, for plaintiffs.

Andrew S. Friedman, Wachsler, Skirnick, Harwood Halebian & Feffer, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiffs are former shareholders of Michigan National Corporation ("MNC") who sold MNC shares between November 3, 1994 and February 3, 1995 (the "Class Period"). De-

fendants are bank holding company Michigan National Corporation, its chairman and chief executive Robert J. Mylod, its president and chief operating officer Douglas Ebert, and its chief financial officer, Joseph Whiteside. Plaintiffs have filed this putative class action [1], alleging that Defendants have violated various federal securities laws, breached their fiduciary duty, and committed common law fraud. This case comes before the Court on Defendants' motion to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons stated below, Defendants' motion is denied.

## THE AMENDED COMPLAINT

In their 92 page complaint, Plaintiffs make the following allegations. In February, 1994, Heine Securities Corporation ("Heine"), an MNC shareholder, began to publicly demand a sale of the company. Heine sought and obtained the support of numerous MNC shareholders, who in turn voted over 35% of MNC's outstanding shares against the MNC board at the April, 1994 Annual Meeting.

Over the next year, the individual defendants allegedly recognized growing shareholder dissatisfaction with the MNC Board of Directors, and realized that if the present directors did not secure a "White Knight," or friendly bidder, the shareholders would replace them with a new board at the next Annual Meeting in April, 1995. As a result, Defendants and their agents, the CS first Boston Corp. ("First Boston") and Keefe Bruyette & Woods ("KBW") contacted National Australian Bank ("NAB") and began pursuing a merger, through which MNC's managers would remain in their positions, and could reap lucrative financial benefits through the sale of their stock.

██ As an important element of the fraudulent scheme to retain their positions which is alleged, the board members began a Self-Tender on November 3, 1994. Defendants claimed at the time that the Self-Tender was a part of MNC's restructuring plan. Through the Self-Tender, MNC attempted to buy over 10% of its outstanding shares and all outstanding contracts at a purchase price between $78–$90 per share. Defendants used a "Dutch Auction" tender method, by which shareholders indicated the lowest price at which they were willing to tender their shares. Defendants then determined a price, and all shareholders who were willing to tender at or below that price were allowed to do so. Additionally, because the interim Trustee of MNC's employee benefit plans could utilize its discretion to tender shares for which instructions were not received, MNC would be able to purchase the requisite number of shares at the low end of the range. Due to this "structural effect," Defendants were able to set a price of $78 per share, and purchased over 2,000,000 shares of MNC stock, and over 294,000 contracts at $21.675 each. As a result of Defendants' scheme, the purported class members were fraudulently induced, allegedly, to sell their MNC securities through the Tender Offer at the $78 per share price.

Plaintiffs further claim that the Dutch Auction had the effect of making MNC ineligible for the pooling of interests method of accounting (the "pooling method"), because MNC had purchased over 10% of its stock in a six month period. According to Plaintiffs, the vast majority of American banks utilize the pooling method. Therefore, the Self-Tender created a "defensive effect," which caused MNC to be considerably less vulnerable to a bid by a domestic company. However, a foreign bank, such as NAB, which was not dependent upon that accounting method, would still be able to pursue a merger with MNC.

Also in furtherance of the fraudulent scheme, it is alleged that Defendants issued false and misleading statements, in order to

---

**1.** Plaintiffs purport to bring this action on behalf of themselves and "a class consisting of all persons and entities who sold shares of the common stock of MNC ("stock") and/or detachable cancelable [sic] mandatory stock purchase contracts of MNC ("contracts"), a security that entitles the holder to purchase a specified amount of MNC stock for $56.375 per share (the stock and contracts of MNC are collectively referred to as the "MNC Securities"), during the period from November 3, 1994 through and including February 3, 1995 (the "Class Period").... No motion has been made to certify the class.

convince the market and potential bidders for MNC that MNC planned to remain independent. By concealing their actual plan to sell the company, Defendants would be able to artificially depress the price of MNC stock, so that NAB's offer price would provide a substantial premium over the market price. Further, such a deception would inhibit other entities from pursuing acquisition of MNC, which might put MNC "in play" or cause the stock price to rise, and jeopardize the merger agreement with NAB.

On December 8, 1994, Defendants issued a press release which stated that the Board was committed to "maintaining the company's independence and maximizing shareholder value." On December 19, 1994, Defendants issued a press release by which they announced a possible increase in MNC's dividend and a stock split, which they would consider at their next board meeting.

However, on February 5, 1995, Defendant Michigan National Corporation announced a merger with a subsidiary of NAB. The proposed merger agreement provided for MNC's remaining shareholders (a group which no longer included Plaintiffs) to receive $110 in cash for their shares. The agreement also allowed MNC management to retain their positions, as well as potentially reap a financial windfall in excess of $32 million, due to "golden parachute" provisions. The Defendants also entered into various defensive transactions, so as to ensure that the company would be sold to NAB. These transactions included a "no-shop" clause and a "lock-up" option, by which NAB would receive more than $60 million if MNC were not sold to NAB.

Plaintiffs claim that Defendants made misrepresentations or omissions of material facts in connection with the Self–Tender offer in violation of Sections 10(b)[2], 13(e)[3], 14(e)[4] and 20(a)[5] of the Exchange Act of 1934 (the "Exchange Act") and SEC Rules 10b–5[6], 13e–3[7], and 13e–4[8] promulgated thereunder.

2. Section 10(b) provides, in relevant part:
It shall be unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate ... 15 U.S.C. § 78j(b).

3. Section 13(e) provides, in relevant part:
It shall be unlawful for an issuer which has a class of equity securities ... to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or for the protection of investors, may adopt (A) to define acts and practices which are fraudulent, deceptive or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices.... 15 U.S.C. § 78m(e).

4. Section 14(e) provides, in relevant part:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. 15 U.S.C. § 78n(e).

5. Section 20(a) provides, in relevant part:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C. § 78t(a).

6. SEC Rule 10b–5 provides, in relevant part:
It shall be unlawful for any person ... (a) To employ any device, scheme or artifice to fraud. (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

7. Rule 13e–3 governs the information that an issuer must provide in connection with a self-tender "which has either a reasonable likelihood or a purpose of producing, either directly or indirectly" the delisting of a company's publicly traded equity securities. 17 C.F.R. § 240.13e–3.

8. Rule 13e–4 provides, in relevant part:
It shall be a fraudulent, deceptive or manipulative act or practice, in connection with an issuer tender offer, for an issuer or an affiliate of such issuer, in connection with an issuer tender offer ... (ii) To make any untrue statement of a

**1150**

Additionally, Plaintiffs allege that Defendants committed common law fraud and breached their fiduciary duty under state law.

## RULE 12(b) STANDARD

██ Dismissal for failure to state a claim should be granted by this Court as a matter of law if it appears that, in the light most favorable to Plaintiff, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and with every doubt resolved in his behalf, *Belt v. Johnson Motor Lines, Inc.,* 458 F.2d 443 (5th Cir.1972), the complaint fails to state any valid claim for relief, *Balistreri v. Pacifica Police Dep't,* 855 F.2d 1421 (9th Cir.1988). A complaint should not be dismissed unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## DEFENDANTS' MOTION TO DISMISS

### A. Plaintiffs' Defensive Purpose, Structural Effect and Defensive Effect Claims

In their Motion to Dismiss, Defendants argue that Plaintiffs' allegations that Defendants failed to disclose the "defensive purpose" and "defensive effect" of the Self–Tender, and its alleged unfairness (or the "structural effect"), must be dismissed for failure to state a claim under the federal securities laws. Defendants categorize these allegations as mere attempts to transform breach of fiduciary duty claims into claims under the federal securities laws, which is prohibited by *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

In *Santa Fe,* the Supreme Court determined that claims of corporate mismanagement and breach of fiduciary duty, without more, are not actionable under the federal securities laws. *Id.* at 479, 97 S.Ct. at 1304. Courts following *Santa Fe* have dismissed federal securities law claims based on a failure to disclose facts material only to a breach of fiduciary duty claim. *Field v. Trump,* 850 F.2d 938, (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Lewis v. Chrysler,* 949 F.2d 644, 651 (3d Cir.1991); *Biechele v. Cedar Point,* 747 F.2d 209, 217 (6th Cir.1984); *Lessner v. Casey,* 681 F.Supp. 415 (E.D.Mich.1988).

██ In this instance, Plaintiffs' claims that Defendants failed to disclose the defensive purpose, defensive effect, and structural effect of the Self–Tender fall within the *Santa Fe* prohibition. First, the defensive purpose claim is essentially equivalent to a claim of management entrenchment, which, under *Santa Fe,* is not actionable as a federal claim. *See, e.g., Chrysler,* 949 F.2d at 651 (holding Defendant's failure to disclose management's entrenchment plan did not state claim under the federal securities laws).

██ Similarly, Plaintiffs' claim that the documents failed to disclose the "structural effect," or unfairness, of the Dutch Auction procedures fails to state a federal claim. In the absence of manipulative or deceptive practices such as rigged prices or matched orders, "the fairness of the terms of the transaction is at most a tangential concern of the statute." *Santa Fe,* 430 U.S. at 476, 478, 97 S.Ct. at 1302, 1303.

██ Plaintiffs' allegation that Defendants' failed to disclose a "defensive effect" must also fail. The company does not have a duty to disclose those effects which are obvious to a reasonable shareholder. *Chrysler,* 949 F.2d at 651 (holding that Defendant's failure to disclose how management might use a "poison pill" to its advantage was not actionable, "because the investing public is charged with 'knowledge of information of which they reasonably should be aware', which includes 'the "universal" interest of corporate officers and directors in maintaining corporate control.'" (citation omitted)). Further, Plaintiffs themselves have cited press articles which describe the defensive effect. Plaintiffs may not base federal securities fraud claims on a failure to disclose information that was widely distributed in

material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.... 17 C.F.R. § 240.13e–4.

the media. *See Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1040–1041 (6th Cir. 1991).

More importantly, Plaintiffs' "defensive effect" claim must be dismissed because it is hypothetical. Securities fraud claims which are based on mere speculation will not stand. *Biechele*, 747 F.2d at 216. Plaintiffs claim that the Self–Tender could cause unknown companies which might be interested in a merger to decline to make such a proposal, if those companies were dependent upon a pooling system of accounting. Plaintiffs allege that the vast majority of American banks are dependent upon such a system. However, Plaintiffs have acknowledged in their complaint that the defensive effect of the Self–Tender could have been corrected by a subsequent decision by the Board of Directors to reissue the "tainted" stock. Plaintiffs' defensive effect theory assumes that the Directors will breach their fiduciary duty to shareholders at some later unknown point, when an interested company presents itself.

The Court finds that Plaintiffs' defensive purpose, defensive effect, and structural effect theories do not provide a basis for claims under the federal securities laws. These claims all fall within the ambit of *Santa Fe*, and constitute claims of breach of fiduciary duty, rather than failure to disclose material information.

**B. The Statements of Mark Belsky**

Plaintiffs have also alleged that MNC official Mark Belsky, who is not a defendant in this action, falsely stated to the press that the Self–Tender was not conducted so as create the defensive effect. This alleged misrepresentation does not state a claim under the federal securities laws. Belsky was quoted as saying that "It [the Self–Tender] was not done with the idea of putting up a defense." However, this alleged misrepresentation is *per se* immaterial, because the Self–Tender was completed almost two months before the statement, and therefore, shareholders could not have relied upon the decision in deciding whether to tender their shares during the class period. Therefore, Plaintiffs' allegation that Belsky's statement were misleading or fraudulent fails to state a claim.

**C. The Fraud Claims Based Upon Defendants' Failure to Disclose Merger Negotiations which Allegedly Occurred Before or During the Self–Tender**

Plaintiffs also claim, on information and belief, that Defendants failed to disclose that "(a) the defendants had already determined that they would explore and consider a sale of MNC at a price above those being offered in the Tender Offer and would pursue a sale of MNC following the completion of the Tender Offer, and/or (b) the defendants were already aware that NAB was interested in, and was able to purchase MNC, and had decided to negotiate the sale of MNC to NAB following the Completion of the Tender Offer, or (c) the defendants and/or agents of MNC had already commenced confidential discussions and negotiations with representatives of Australia Bank concerning its friendly acquisition of all of MNC's outstanding common stock at a substantial premium over the market price of the stock and the prices being offered by MNC in the Tender Offer." Amended Complaint at ¶ 6(3). Plaintiffs claim that Defendants' failure to disclose this information, as well as Defendants' continued assertions that MNC was committed to remaining independent, violated the federal securities laws and constituted common law fraud. This claim does not fall within the *Santa Fe, supra,* exception, because Plaintiffs have alleged a misrepresentation or omission of material facts. A failure to disclose merger discussions violates Rule 10b–5 if those discussions would be material to a reasonable shareholder. *Basic v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988).

Defendants move to dismiss these fraud claims for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). A complaint alleging securities fraud is subject to a heightened standard of pleading under Federal Rule of Civil Procedure 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting the

fraud or mistake shall be stated with particularity." In the Sixth Circuit, however, strict application of Rule 9(b) in complex securities fraud cases is disfavored. *Michaels Building Co. v. Ameritrust*, 848 F.2d 674, 674 (6th Cir.1988). We are taught that courts should interpret Rule 9(b) "in harmony" with Rule 8, which requires simple pleadings. *Id.* at 679–680 (6th Cir.1988). The purpose of Rule 9(b) is to provide defendants with notice adequate to prepare a proper responsive pleading. *Id.* at 679. The particularity requirement also protects defendants' reputations, and "inhibits the filing of complaints that are a pretext for the discovery of unknown wrongs, or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves." *In re Consumers Power Co. Securities Litigation*, 105 F.R.D. 583, 591 (E.D.Mich.1985).

 Rule 9(b) requires that Plaintiffs identify: (1) the participants in the alleged fraud; (2) the representations made; (3) how the statements are allegedly misleading or false; (4) the time, place and content of the representations; (5) the fraudulent scheme; (6) the fraudulent intent of the defendants; (7) the plaintiffs' reliance on the fraud; (8) the plaintiffs' injury as a result of the fraud. *Michaels Building*, 848 F.2d at 679. As a general rule, fraud allegations may not be based upon information and belief. However, this general rule may be relaxed in complex securities fraud actions as to matters peculiarly within the knowledge of the defendants. *In re Consumers Power Co. Securities Litigation*, 105 F.R.D. at 591 (citation omitted). Plaintiffs pleading matters within the knowledge of the defendants on information and belief must indicate the facts upon which the belief is based. *Id.* at 592.

As support for the fraud claims, Plaintiffs rely upon the following facts, set forth in ¶ 27 of the Amended Complaint: (1) Following the merger announcement, an NAB spokesman told the press that NAB "had been stalking [MNC] for some time" and that the companies first had discussions in 1992. (2) Defendants confirmed that "informal talks" had occurred between NAB and MNC in 1992, although "serious discussions did not start until after January 1, [1995]." (3) The same KBW and First Boston advisors who served as underwriters to MNC's Self–Tender also advised NAB, just a few weeks after the Self–Tender. (4) The KBW President stated before the class period opened that he did not believe that MNC could remain independent, even if it desired to do so. (5) Defendants knew that they would probably lose a proxy fight at the April, 1995 election, and they would be replaced if they did not secure a White Knight. Defendants knew a domestic bank would terminate MNC's senior management, so the White Knight had to be a foreign bank. Defendants were aware of NAB's interest in purchasing an American bank. (6) The individual defendants agreed not to sell any stock during the Class Period. By selling after the completion of the deal with NAB, they stood to gain over $30 million in benefits. (7) "Other knowledgeable parties have inferred that Defendants were negotiating with NAB prior to January 1995." Plaintiffs quote former MNC CEO Stoddard as saying, "management should have publicly announced it was considering a takeover and sought other bids." Additionally, Plaintiffs cite an "MNC insider," who stated that although the MNC directors preferred remaining independent, "they realized they needed to be realistic".

 Plaintiffs may plead their allegation of merger negotiations based upon information and belief, because that information is peculiarly within the knowledge of Defendants. The Court must now determine whether the facts Plaintiffs have provided form an adequate basis for their alleged belief. The majority of Plaintiffs' "facts" do not provide a basis for an inference of fraud. The claim that Defendants "knew" that they would lose a proxy fight at the next Annual Meeting, and that they would be replaced if they did not secure a White Knight, is speculative and conclusory. The speculation of experts that MNC would be unable to remain independent cannot support a reasonable inference that Defendants committed fraud.

 However, Plaintiffs also cite the directors' failure to tender any personally held stock during the self-tender as evidence supporting the existence of another plan, and a

reasonable inference of fraud. Defendants counter, in argument, that such a practice is standard in the industry, because it demonstrates the Board's faith in the company. Defendants cite, as an example, *Abajian v. Kennedy*, 1992 WL 8794, *2, 1992 Del.Ch. LEXIS 6, *6 (Ct.Ch.Del. January 17, 1992). While that case does involve a situation where the officers unanimously determined not to tender their shares during the self-tender period, it does not defeat the inference that Plaintiffs ask the Court to draw, and Defendants ask the Court to consider facts beyond the face of the pleadings. Plaintiffs have alleged that by retaining their shares until the merger with NAB, the three individual defendants stood to gain stock and option packages valued in excess of $30 million. Pursuant to the merger, Defendants ultimately were enabled to sell their shares at $110 per share, which represents a substantial premium over the $78 per share obtained by the members of this putative class.

██ Defendants' motives in retaining the stock are factual issues not properly resolved on a Rule 12(b) motion to dismiss. In adjudicating this motion, the Court must take the well-pleaded aspects of the complaint as true, drawing all reasonable inferences in favor of Plaintiffs. Therefore, this Court finds that under all of the other circumstances of this case, Defendants' failure to tender their shares does give rise to a reasonable inference of fraud. Further, Plaintiffs have pled the other requirements of fraud in a manner sufficient to put defendants on notice of the allegations against them, and enable them to prepare a proper responsive pleading. Thus, Plaintiffs have presented a claim under the federal anti-fraud provisions of Section 10–b and Rule 10b–5, the control person liability provisions of Section 20(a), as well as under common law fraud. Therefore, Defendants' motion to dismiss is denied as to Counts I, IV and V. Further, because Plaintiffs have pleaded their claim that Defendants engaged in merger negotiations prior to or during the Class Period with sufficient particularity, they have also stated a claim under the provisions of Sections 13(e) and 14(e) of the Exchange Act, and the SEC Rules promulgated thereunder. Those provisions govern disclosure and prohibit fraud in connection with tender offers. Thus, Defendants' motion as to Counts II and III must be denied.

### D. Duty to Update

██ Alternatively, even if Defendants did not negotiate a merger with NAB prior to January, 1995, Plaintiffs claim that Defendants were required to correct their prior statements concerning MNC's commitment to remaining independent. In the absence of a duty to disclose, silence is not actionable under the federal securities laws. *Basic*, 485 U.S. at 238 n. 17, 108 S.Ct. at 987 n. 17. Recently, the Seventh Circuit held that "a company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong...." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1333 n. 9 (1995). In this Circuit, Defendants rely upon *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 243 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)[9]. In *Starkman*, determined that a board's statements professing its belief that it would be best for the company to remain independent were not misleading in context, "and at most expressed a sincere hope which the board found unrealistic under the pressure of Mobil's offer." *Id.* at 243.

The primary case upon which Plaintiffs rely, *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir.1993), cert. denied, —— U.S. ——, 114 S.C. 1397, 128 L.Ed.2d 70 (1994), actually supports Defendants. Although the *Time Warner* court did note that under certain circumstances, a "duty to update" may exist, the court determined that indefinite statements "suggest only the hope of any company," and were not materially misleading. 9 F.3d at 267.

---

**9.** Plaintiffs urge that *Starkman* is no longer persuasive authority, because it was overruled by *Basic v. Levinson, supra*. However, this Court agrees with Defendant's argument that *Basic* affected only that part of *Starkman* which held that merger discussions are never material until the parties have reached an agreement-in-principle.

In this case, Defendants' statements, as pled here, can be read only to have expressed their presumed opinion at the time that independence was in the best interest of MNC shareholders. They apparently expressed a "hope" which they later found "unrealistic." Plaintiffs do not allege that Defendants made any promises as to continued independence. Indeed, Plaintiffs acknowledge in the Amended Complaint that defendant Mylod was quoted as stating that any merger proposal "should go before the full board." Amended Complaint, ¶ 55.

Additionally, Plaintiffs fail to state a claim for a "failure to update", because they have cited in the Amended Complaint numerous commentaries in the press which indicated that it was highly unlikely that MNC would be able to remain independent. Plaintiffs may not state a claim for failure to disclose information that was "widely disseminated in the media." *See Sinay v. Lamson & Sessions,* 948 F.2d 1037, 1040–41 (6th Cir.1991). Given the considerable press speculation about the likelihood of a takeover, reasonable investors were alerted that MNC's continued independence was not assured. For these reasons, Plaintiffs are unable to state a claim based upon Defendants' failure to update hopeful projections of continued independence.

### E. Breach of Fiduciary Duty Claims

Finally, Defendants move to dismiss Plaintiffs' breach of fiduciary duty claims. Defendants first argue that the state law claims should be dismissed under 28 U.S.C. §§ 1367(c)(2) and (3). However, as Plaintiffs' federal claims are viable, the state law claims may not be dismissed in this manner. Alternatively, Defendants contend, the claims must be dismissed because the claims are derivative in nature, and Plaintiffs have failed either to make a pre-suit demand on the board or to plead demand futility, as required by statute. Further, as persons who have sold their shares, Plaintiffs do not have standing, because they fail to meet the contemporaneous ownership requirement. Finally, Defendants contend, Plaintiffs claims must be dismissed because there is no "duty to auction."

Under Michigan law, "corporate officers and directors owe the fiduciary duty of care and loyalty to the corporation and to its shareholders." *Gaff v. Federal Deposit Insurance Corp.,* 828 F.2d 1145, 1151 (6th Cir. 1987) (citing *Berman v. Gerber Products Co.,* 454 F.Supp. 1310, 1319 (W.D.Mich.1978), *affd, James v. Gerber Products Co.,* 587 F.2d 324 (6th Cir.1978)); *In re Rospatch Securities Litigation,* 760 F.Supp. 1239, 1259 (W.D.Mich.1991); *Plaza Securities Co. v. Fruehauf Corp.,* 643 F.Supp. 1535, 1542 (E.D.Mich.1986); *Thomas v. Satfield Co.,* 363 Mich. 111, 108 N.W.2d 907 (1961). A breach of this fiduciary duty provides a direct cause of action to the shareholders. *Gaff,* 828 F.2d at 1151 (citation omitted).

Fiduciary duties require that the directors act on the shareholders' behalf, in good faith, "with the degree of diligence, care and skill ... which an ordinarily prudent and loyal person would exercise under similar circumstances in a like position." *Fruehauf,* 643 F.Supp. at 1542 (citation omitted). This Court has held that once it is apparent that it is inevitable that a corporation will be sold, "the directors' cardinal fiduciary obligation to the corporation and its shareholders is to ensure 'maximization of the company's value at a sale for the stockholders' benefit.'" *Fruehauf,* 643 F.Supp. at 1543 (citation omitted).

In this case, a factual issue exists as to when, if ever, it appeared inevitable that the corporation would be sold. Therefore, this Court cannot determine at this time that no duty to maximize the company's value attached while Plaintiffs were shareholders. Additionally, Plaintiffs have sufficiently pled allegations of fraud, which, if proven, would also constitute a breach of fiduciary duty by the defendant directors. The Court finds that Plaintiffs have pled a sufficient basis for their individual breach of fiduciary duty claims, and Defendants' motion to dismiss is denied as to Count VI.

\* \* \* \* \* \*

Although many of Plaintiffs' theories for relief fail to state a claim under the federal securities laws, Plaintiffs have, nonetheless,

presented one viable theory upon which to base their claims.

Now, therefore;

IT IS ORDERED that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is DENIED.

IT IS SO ORDERED.