THOMAS v. SATFIELD COMPANY.

1. CORPORATIONS—DIRECTORS AS FIDUCIARIES.
    Directors of a corporation occupy a fiduciary relation toward the corporation and its stockholders, and are treated by courts of equity as trustees.

2. SAME—DIRECTORS—GOOD FAITH.
    Directors of a corporation are regarded as agents entrusted with the management of the corporation for the benefit of the stockholders collectively and, as trustees, are held to the utmost good faith in their dealings with the corporation, and are required to manage its affairs solely in its interest (CLS 1956, § 450.13).

3. SAME—DIRECTORS.
    Defendants, directors of plaintiff bowling alley operator corporation and of corporation which had built and owned the building housing the bowling alleys, had the burden of proving the essential fairness of lease entered into between the 2 corporations, which was not shown to have been executed as a result of the lessor having made material misrepresentations (CLS 1956, § 450.13).

4. SAME—DIRECTORS—SUBORDINATION OF PERSONAL INTERESTS.
    A director who buys from or sells to the corporation must subordinate his personal interests to the interests of the corporation, its stockholders, officers and employees, and its creditors (CLS 1956, § 450.13).

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 13 Am Jur, Corporations § 997.
[3, 5] 13 Am Jur, Corporations § 1001.
[4, 6] 13 Am Jur, Corporations § 1004.

5. SAME—DIRECTORS—REFORMATION OF LEASE—BOWLING ALLEYS.

Reformation of lease of bowling alley premises to accord lessor corporation a 12–1/2% return on investment *held*, proper, where defendant individuals were directors of both plaintiff and defendant corporations and had failed to sustain their burden of proving fairness of lease as executed and to have allowed it to stand would have resulted in profits that were unexpected as of the time lease was executed, since the common directors had an obligation to make disclosure subsequently.

6. SAME—DIRECTORS—BUSINESS ACUMEN—UNEXPECTED PROFITS—DEALING WITH CORPORATION.

Fact that defendant director effected a saving in costs as a result of his business acumen when erecting building which he and a corporation he controlled leased to plaintiff corporation of which he was also a director, pursuant to preliminary arrangement whereby the lessor was to have a 12–1/2% return on the investment, did not entitle him to unexpected profits as he is required to use such acumen for his corporation's benefit rather than his own when he undertakes to deal with his corporation (CLS 1956, § 450.13).

Appeal from Wayne; Bowles (George E.), J. Submitted January 6, 1961. (Docket No. 46, Calendar No. 48,636.) Decided April 26, 1961.

Bill by Harry Thomas, Henry Nosakowski, and Star Lanes Corporation, a Michigan corporation, against Satfield Co., a Michigan corporation, Abraham Satovsky, and Lester Satovsky to reform lease and for accounting. Decree for plaintiffs. Defendants appeal. Affirmed.

*Lewis Daniels* and *James M. Wienner,* for plaintiffs.

*Abraham Satovsky,* for defendants.

SOURIS, J. This is an appeal from a Wayne circuit court decree reforming a lease between plaintiff Star Lanes Corporation, lessee, and defendant Satfield Company, lessor, on grounds of constructive fraud.

The reformed lease would reduce the yearly rental on a bowling alley from $40,000 to $32,400. The defendant lessor appeals, claiming that the record discloses no equitable grounds for this reformation.

Essentially, this appeal concerns the plan of 4 men to pool their resources in order to build and operate a bowling alley in a suburb of Detroit. The 4 included a lawyer, a builder, a bowling consultant, and a clothing store operator with considerable sales ability.

To accomplish their mutual plan, 2 corporations were formed. The lawyer and the builder formed the first one, July 7, 1956, to buy, build, and own the bowling alley. To do so they took in others who were furnishing part of the needed money. They called it the Satfield Company.

The shareholders of Satfield are Lester Satovsky, the builder, and Margaret Satovsky, each of whom own 12–1/2% of the stock in their own name. The remaining 75% is held by Abraham Satovsky, the lawyer, as trustee for various persons.

All 4 would-be entrepreneurs then formed the prospective operating company January 16, 1957, which they called Star Lanes, Inc. This time the clothier and the bowling consultant brought in an associate.

The shareholders of Star Lanes are Lester and Abraham Satovsky, Harry Thomas (the clothier), Henry Nosakowski (the bowling consultant), and Lewis Sulkin (associate of the last two). The Satovskys, Thomas, and Nosakowski are the officers and directors of Star Lanes.

On February 27, 1957, the 2 corporations then negotiated and signed a lease on a building which Satfield undertook to build and Star Lanes to operate. The lease was for 10 years, with a yearly rental of $40,000. The building which Satfield was to build and Star Lanes was to operate was described thus:

"One-story bowling alley building approximately 200 ft x 162 ft on land approximately 500 ft x 250 ft containing space accommodations for 32 alleys, located at 28435 Northwestern highway, Southfield township, Michigan, landlord to be sole judge as to the erection of said building except that it shall comply with the building department requirements of Southfield township."

Satfield built the bowling alley; Star Lanes went into possession; and on September 1, 1957, bowling commenced. Difficulties with the building and with Star Lanes' finances ensued, and by 1959 Star Lanes was behind in its monthly payments. Satfield began proceedings before an Oakland county circuit court commissioner to regain possession. Star Lanes then filed a bill of complaint in equity in Wayne county alleging fraud and seeking to restrain Satfield's ejectment suit and to reform the lease. The friends had, as the circuit judge put it, "lost their sense of togetherness."

At trial 2 extraneous matters were spread extensively on the record. The first concerned the failure of the entrepreneurs to secure a liquor license for the bowling alley restaurant. It is apparent this failure adversely affected Star Lanes' profits. The second pertained to a variety of complaints about the building supplied by Satfield. Since neither topic is referred to in any stated appellate question, we will not detail the disputed and undisputed testimony which relates to these issues. Michigan Court Rule No 67, § 1 (1945).

The essential legal dispute hinges upon Star Lanes' contention that the $40,000 yearly rental set by the lease was agreed to as a 12–1/2% return on an investment in the bowling alley of $320,000 on the part of Satfield and that, as furnished, the bowling alley did not represent nearly that sum.

It is undisputed that no such agreement was set out in the written lease. But plaintiffs-appellees contend that the individual defendants, as members of the board of directors of Star Lanes, had a fiduciary relationship which required them to disclose the relevant facts on this subject to Star Lanes, Inc., and that they breached their duty by failing to do so.

The facts upon which plaintiffs seek to sustain allegations of actual fraud are none too clear. They involve a controversy over rental which occurred just before signing of the lease. Plaintiffs contend that they refused to sign the lease at a $40,000 figure, arguing instead that only $32,000 was justified until finally convinced by Lester Satovsky that $40,000 was justified by building costs. In this regard, they contend that Satovsky represented that Satfield's building costs were $320,000 without any profit to it, that they believed this, and signed the lease because of that representation.

That such estimated cost was not at all exorbitant was established by testimony offered by defendants that one general contractor submitted a bid to construct the building for $310,000, not including the cost of land, and that another general contractor submitted a bid of $356,000, likewise not including the cost of land. The land actually purchased by Satfield for the bowling alley cost it about $75,000.

The record discloses that the original understanding between the parties was that the bowling alley would be constructed, at least in part, with outside funds. Efforts were made to procure a mortgage from banks, insurance companies, mortgage companies, and others and some effort was made to induce other investors into the deal, all without success. Evidently, Satovsky ultimately determined to finance the bowling alley himself, through Satfield, because he proceeded without outside financing to

take the bids on the building described above. When the bids were received, he concluded that they were too high and determined to act as general contractor for Satfield himself. Had the actual cash costs equalled $320,000, there would be no basis for the plaintiffs' present complaints and the rental provided for in the lease presumably would be satisfactory to all parties. Actual land and construction costs were substantially less, however, and this suit is, fundamentally, a contest between the parties to determine who is to benefit from the savings.

Satfield and the individual defendants rely upon a strict, literal reading of the lease and contend that any savings realized inure to Satfield's benefit. Plaintiffs, on the other hand, reply that the agreement contemplated payment by Star Lanes of $40,000 annual rental for a $320,000 bowling alley; that the rental was computed on the basis of a 12-1/2% return to Satfield; and that any reduction in Satfield's investment should inure to Star Lane's benefit by a corresponding reduction in its rental obligation because it would be unconscionable to permit defendants to thus profit at the expense of Star Lanes, Satovsky owing Star Lanes a high standard of fairness as its president and a director.

Interrogatories which were entered into the record of the hearing established that the actual out-of-pocket cost of building construction and land acquisition was $249,474.37, which sum includes the cost of some land not included in the lease. The builder testified that his skill enabled him to hold the actual costs so far below his original estimate. He testified that savings resulted from "shopping around," paying cash, doing some of the work himself, and even on occasion representing that materials he sought to purchase were to be used in the construction of a charitable institution. He testified that he felt under

no obligation to inform the plaintiffs of the costs he was actually incurring.

He also contended that over and above cash outlay, he was entitled to have credited to his investment 10% ($24,947) for supervision, another 10% for overhead, another 10% for profit, and another 10% for finance charges—or a total investment of $349,-262.37. It is conceded that none of these percentages has actually been paid.

The circuit judge held:

"Considering the relationship of the parties as outlined hereinbefore, and the fiduciary responsibilities placed upon corporate officers and directors, it is my holding that Lester Savotsky had an obligation to make a full disclosure to plaintiffs at the time the lease was executed and if he did not have full knowledge at that time, had an obligation thereafter when he acquired full knowledge to disclose to plaintiffs what they were being charged and how much profit he was expecting to realize from the transaction. To allow Lester Satovsky to not only make a profit but to make charges also for financing which indeed was not established upon trial, and for supervision and overhead as well, when Nosakowski and Thomas had made substantial contributions of talent and effort worth dollars, for which they were not compensated in dollars, would be inequitable and unconscionable. We are not surprised that the 3 friends and associates lost their sense of togetherness.

"As to the relief to be afforded, we believe that plaintiffs are entitled to reformation of the lease on the basis of constructive fraud. Although there is some question whether or not all of the real estate acquired by Satfield Corporation has been put to the use of the operating company, I shall allow the whole of the several costs listed in defendants' answer to plaintiffs' interrogatories, totaling $249,-474.37. I shall allow $10,000 for supervision of the project, and disallow the claimed charges for over--

head, profit and finance charges; or will allow costs
of $259,474.37.

"I hold that 12–1/2% annual rental is a fair rela-
tionship between cost of construction and rent. Ac-
cordingly, the lease may be reformed to show an
annual rental of $32,400 per annum, or $2,700 a
month."

If we were required to decide this appeal upon
grounds of actual fraud, we would reverse. We
cannot find in this record that plaintiffs bore the
burden of proof in establishing that defendants made
material misrepresentations which induced the sign-
ing of this lease. And, indeed, the circuit judge
made no finding of actual fraud. His opinion indi-
cates that the reformation granted rests upon his
finding that the individual defendants had a fidu-
ciary duty to plaintiff Star Lanes, Inc., to disclose
construction costs when they were ascertained, and
presumably to adjust rental in accordance therewith.

For authority, the circuit judge relied upon very
familiar case law:

"The rule is thoroughly embedded in the general
jurisprudence of both America and England that
the status of directors is such that they occupy a
fiduciary relation toward the corporation and its
stockholders, and are treated by courts of equity as
trustees. They are regarded as agents entrusted
with the management of the corporation, for the
benefit of the stockholders collectively, and as occu-
pying a fiduciary relation in the sense that the
relation is one of trust; and are held to the utmost
good faith in their dealings with the corporation.
They must manage the affairs of the corporation
solely in the interest of the corporation." 2 Thomp-
son, Corporations (3d ed), § 1320, cited in *L. A.
Young Spring & Wire Corp.* v. *Falls,* 307 Mich 69,
101.

The issue, as we see it, involves consideration of
Satovsky's conduct in the light of the statutory

standard of fairness imposed by section 13, subd
(5), of the general corporation law* whenever 2
corporations having common directors enter into
contractual relations.   That section provides:

"5. No contract of any corporation made with any
director of such corporation or with a partnership
or other group or association of which any such
director shall be a member or with any other cor-
poration of which such director may be a member
or director and no contract between corporations
having common directors shall be invalid because
of such respective facts alone.   When the validity
of any such contract is questioned, the burden of
proving the fairness to the contracting parties of
any such contract shall be upon such director, part-
nership, other group or association, or corporation
who shall be asserting the validity of such contract."

Thus, the defendants had the burden of proving
the essential fairness of the lease.   The circuit judge,
quite obviously, concluded it was unfair to plain-
tiffs, and we concur.

As the circuit judge observed, we entrust a cor-
poration's directors with the management of its
affairs and impose upon them fiduciary duties re-
quiring the utmost good faith whenever they deal
with the corporation they serve.   When a director
buys from or sells to the corporation, his personal
interests must be subordinated to the interests of
the corporation, its stockholders, officers and em-
ployees, and its creditors.   Our legislature has rec-
ognized the possible conflict between personal and
corporate interests, but in recognition also of the
occasional necessity for dealings between a director
and his corporation or between 2 corporations with
common directors, it has established a standard of
fairness and imposed the burden of proving fair-

---

* CLS 1956, § 450.13, subd (5) (Stat Ann 1959 Cum Supp § 21.13,
subd [5]).

ness upon the director or the corporation whose actions are challenged.

Not infrequently, particularly when large publicly owned corporations are involved, a director may with reasonable safety deal with his corporation by so divorcing himself from the corporate action in connection with the transaction, leaving disinterested directors in complete control of the corporation's actions, that it may be said in truth the parties dealt at arm's length. The statutory requirement of fairness to the corporation remains the same, but the burden of proving fairness in such circumstances is substantially lessened.

In the case at bar, however, 2 closely held corporations with common directors and officers were dealing with one another. That the parties did not deal with one another strictly at arm's length is evident not only from the fact that Satovsky was an officer and a director of both corporate parties, but also from the fact that the lease itself contains rather unusual provisions not normally expected to be found in leases negotiated between parties completely independent. The most striking provision is the one quoted at the beginning of this opinion by which it is provided that Satfield was "to be sole judge as to the erection of said building." There were no plans or specifications for the building attached to the lease nor was there anything more from which it could be determined what was being leased except a statement that the building be approximately 200 by 162 feet on land approximately 500 by 250 feet, containing space for 32 bowling alleys. In other words, it is perfectly evident Star Lanes placed an immense reliance upon its president's (Satovsky's) good faith and interest in its well being by exercising his *sole judgment* to protect it from paying for less than that for which it bargained. The following testimony of Harry

Thomas on direct examination supports this observation:

"*Q.* After the agreement was brought to my office, and I returned it to you in an opinion, what did you do?

"*A.* We picked up the agreement and we had a letter with it. We went back to a meeting at Abe Satovsky's office. Henry Nosakowski and myself, and Lester was there and Abe and we pointed out the fact, that we were told that $40,000 was too much money for that type of building, and in a letter they could put up a shanty or shack.

"*Q.* Was there anything said by Mr. Lester Satovsky?

"*A.* Well, he just kept repeating how much money it was going to cost him, I can't get it out of my mind, $320,000 or more without any profit and he has to have $40,000.

"*Q.* Do you remember my coming up to Abe Satovsky's office for a final meeting as far as this agreement is concerned?

"*A.* Yes. At the final meeting all of us were there —Abe and Lester Satovsky, Henry Nosakowski, Lew Daniels and myself.

"*Q.* What happened at that meeting?

"*A.* Well, the first thing off the bat that came was the rental; and the minute Mr. Daniels pointed out about the $40,000, immediately Lester got up, stormed out, and he says, 'That's it' and walked out of the room and there we were.   *   *   *

"*Q.* Had you ever said anything to Lester Satovsky prior to that meeting about obtaining leagues?

"*A.* Yes. He at all times was aware I was constantly working, I had practically all of the leagues signed up. Here we hadn't dug a hole in the ground, and had the leagues signed up.

"*Q.* He stormed out of the office, is that right?

"*A.* Yes.

"*Q.* Did you go out to him?

"*A.* Well, I was in a quandary, I had all of these leagues, and signed the contracts personally, I don't

know if I was liable or not, and I followed him out and explained to him and tried to pacify him and cooled him down. He cooled down a little bit and I came back and I said, 'Well, he is our partner, he said he paid $320,000 or more, we have to have confidence, we trust him, we are in business together, let's give him the $40,000.' And we signed the deal.

"*Q.* Did he then proceed to erect a building?

"*A.* Yes.

"*Q.* Did you ever see the plans? Did he ever show you the plans?

"*A.* I never saw any plans."

We have observed that the "sole judge" contractual provision evidences an immense reliance placed upon Satovsky by Star Lanes. It seems certain that Star Lanes would not have acceded to that provision had Satovsky not been its president and a director. Under these circumstances, defendants had the burden of proving they delivered a building in accordance with the expectation of all concerned at the time the lease was executed. It is our conclusion that the "sole judge" contractual provision and the statute, considered together, involving as they do fiduciary duties of fairness, fully justify determination of that disputed issue by reference to events occurring subsequent to execution of the lease involved in this case.

From the record before us, we conclude that the individuals who executed the lease determined the rental on the basis that $40,000 per year would result in a fair return to Satfield for an *investment* of $320,000 represented by its costs for land and construction of the bowling alley. Satovsky testified that he never disclosed to Thomas or Nosakowski the savings he was realizing during the course of construction, savings which in this context were equivalent to secret profits to him through his interest in Satfield. To permit such unexpected profits

on the transaction to inure to Satfield, and thus to Satovsky's benefit, rather than to the benefit of Star Lanes by a pro rata reduction in its rental obligation, would be unconscionable.

It does not lie well with Satovsky to say that at the time the lease was executed he did not yet know how much more advantageous to Satfield the bargain would be than the parties contemplated. Disclosure could have been made subsequently and the rental adjusted accordingly. Nor is it any answer to say that Satfield's reduced costs resulted from Satovsky's business acumen, for the law requires a director to use such acumen for his corporation's benefit rather than his own when he undertakes to deal with his corporation.

On all the facts, it appears that the reformed lease reaches the result which all parties contemplated as being fair prior to its execution.

Affirmed. Costs to plaintiffs.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.