PLAZA SECURITIES COMPANY, a New York limited partnership, Asher Edelman, an individual, FH Acquisition Corporation, a Michigan corporation, FH Partners, L.P., a Delaware limited partnership, and FH Management Corporation, a Delaware corporation, Plaintiffs,

v.

FRUEHAUF CORPORATION, a Michigan Corporation, Jack Breslin, an individual, Donald Chamberlin, an individual, Frank Coyer, Jr., an individual, John Grace, an individual, Russell Howell, an individual, John McCabe, an individual, Thomas Reghanti, an individual, Dean Richardson, an individual, Robert Rowan, an individual, Francis Sehn, an individual, James Wilkerson, an individual, T. Neal Combs, an individual, Leon Alexander, an individual, Robert Siefert, an individual, Defendants.

FRUEHAUF CORPORATION, a Michigan corporation, Plaintiff,

v.

Asher EDELMAN, an individual, Arbitrage Securities Company, a New York limited partnership, Plaza Securities Company, a New York limited partnership, Mountain Associates, L.P., a Delaware limited partnership, Canal-Randolph Limited Partnership, a Maryland limited partnership, United Stockyards Corporation Retirement Plan, a New York trust, Datapoint Corporation, a Delaware corporation, Datapoint Corporation Retirement Income Plan, a Texas trust, Intelogic Trace, Inc. Retirement Income Plan, a New York trust, Stevenson Capital Management Corporation, a New York corporation, HRA & Company, a New York corporation, Raymond French, an individual, Daniel Kail, an individual, Lief D. Rosenblatt, an individual, Gabriel Nechamkin, an individual, Emanuel Perlman, an individual, Charles P. Stevenson, Jr., an individual, and John Does 1 through 25, Defendants.

William STEINER, Moise Katz, Harry Lewis, Cubit Corporation, and John P. Green, Jr., Plaintiffs,

v.

FRUEHAUF CORPORATION, R.D. Rowan, F.P. Coyer, Jr., D.F. Chamberlin, J.P. Grace, T.J. Reghanti, J.S. Wilkerson, D.E. Richardson, J.C. McCabe, F.J. Sehn, Jack Breslin, Russell Howell, Neal Combs, Leon Alexander, Robert G. Siefert, Merrill Lynch & Company and LMC Holdings, Inc., Defendants.

Civ. Nos. 86–71332, 86–71483 and 86–72915.

United States District Court, E.D. Michigan, S.D.

Sept. 26, 1986.

Gregory L. Curtner, Carl H. von Ende, David D. Joswick and Kevin J. Lesinski of Miller, Canfield, Paddock & Stone, Detroit, Mich., Arthur L. Liman, Martin Flumenbaum, Jeh C. Johnson, Philip R. White of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Plaza Securities Co., et al.

William M. Saxton, Justin G. Klimko, Michael J. Lavoie, David H. Oermann of Butzel Long Gust Klein & Van Zile, Detroit, Mich., Kenneth M. Kramer, Robert J. Hausen of Shearman & Sterling, New York City, for Fruehauf Corp., et al.

Carl H. von Ende, David D. Joswick, Gregory L. Curtner of Miller, Canfield, Paddock & Stone, Detroit, Mich., Arthur L. Liman, Martin Flumenbaum of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Charles P. Stevenson, Jr. and Stevenson Capital Management Corp.; Michael G. Tannenbaum of Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, New York City, of counsel.

Robert M. Kornreich of Wolf, Popper, Ross, Wolf & Jones, New York City, for Steiner, et al.

William M. Saxton, Justin G. Klimko, Michael J. Lavoie, David H. Oermann of Butzel Long Gust Klein & Van Zile, Detroit, Mich., Kenneth M. Kramer, Robert J. Hausen of Shearman & Sterling, William Norfolk William Farris of Sullivan & Cromwell, New York City, for defendant Merrill Lynch & Co. Inc.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

These three cases, presented for preliminary injunctive relief, all arise from a contest for control of the Fruehauf Corporation (Fruehauf), a Michigan corporation engaged primarily in the manufacture, sale and leasing of transportation equipment, particularly auto parts, truck trailers and trucking equipment. This court has subject matter jurisdiction over the actions pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, 28 U.S.C. § 1331, and the principles of pen-

dent jurisdiction. A consolidated hearing on the parties' cross motions for preliminary injunction was held on July 24, 1986. This memorandum represents a memorialization of the court's findings of fact and conclusions of law, which were in summary fashion recited on the record after the hearing.

In February of 1986, a group of investors organized by Asher Edelman (the Edelman Group) began purchasing common shares of Fruehauf stock. By March, Mr. Edelman had purchased 9 percent of the corporation's 22 million shares and had unsuccessfully attempted on three occasions to meet with the Fruehauf Board of Directors to discuss the possibility of the financial restructuring or purchase of the company.

In late March, Mr. Edelman proposed to the board a merger between Fruehauf and an entity to be organized by the Edelman Group, pursuant to which Fruehauf stockholders would be paid $41.00 per share. In late April he increased his merger proposal to $42.00 per share. The board rejected each offer promptly with the oral advice of its investment banking firm, Kidder Peabody, which had been retained at least by 1983 to advise the board in the prevention of unwanted takeovers.

In the interim, the Edelman Group commenced soliciting proxies for the purpose of electing a new slate of directors at the annual shareholders meeting scheduled for May 1, 1986. When management refused to provide the Edelman Group with access to its shareholder list, the Group initiated the first of the lawsuits now before the court. A stipulated order for production of the shareholder list was entered on April 3, 1986.

During this period, management and the board issued $50 million worth of previously authorized but unissued convertible preferred stock which, in the event of a takeover, would be exchanged for debentures and thereby impose debt obligations upon the corporation. Debentures in the amount of $135 million were also issued and sold, significantly increasing the corporation's debt.

At the May 1st annual meeting the shareholders elected management's slate of nominees—the current directors. By this time, management appears to have rejected approximately five approaches by the Edelman Group to negotiate toward a merger or other combination.

On June 11th, the Edelman Group announced an all-cash tender offer for all of the outstanding Fruehauf stock at $44.00 per share which was scheduled to conclude on July 3rd. The offer was conditioned upon the Group obtaining sufficient financing. At the time the offer was commenced, members of the Group had agreed to contribute $100 million to the acquisition and had obtained $275 million in firm financing commitments. The Group's financial advisers and bankers were "confident" and "highly confident" that the additional financing would be obtained. It was the opinion of those entities as well that it would be unwise to proceed with firmer commitments until further progress had been made.

The Fruehauf board convened a special meeting on June 11th at which Kidder Peabody's representative informed the directors that the shareholders *would* tender to Edelman, that he *would* be able to pay for the shares, and that he *would* take the corporation if nothing were done to prevent it. Realizing that a transfer of control of the corporation was then inevitable, Fruehauf managers, Messrs. Rowan and Combs, flew to New York the next day to meet with Kidder Peabody to search for an alternative. Within days they had begun to negotiate with Merrill Lynch & Co. (Merrill Lynch) for a management buyout. During those discussions, Merrill Lynch suggested a price in the area of $50.00 per share. Directors Rowan and Combs, however, informed the advisers that they did not wish to participate in the buyout at a price above $48.00 and $48.50 respectively.

The board was presented orally with the outlines of the leveraged buyout proposal designed by Merrill Lynch and Kidder Pea-

body on June 19th. The proposed price of the transaction was not revealed, nor were any written analyses, opinions or evaluations of the company presented. Nevertheless, a consensus in favor of the management buyout was reached immediately and the board appointed a Special Committee of outside directors to evaluate both the management proposal and the Edelman Group's offer, solely on behalf of Fruehauf's public shareholders.

The Special Committee, consisting of Messrs. Richardson, Sehn, Chamberlin, Grace, McCabe and Breslin, met for approximately one hour that same day. Kidder Peabody, the principal architect of the antitakeover program and of this management proposal, and Shearman and Sterling, management's legal advisers, were selected, without consideration of any alternatives, by management to advise the Special Committee. Notably, Kidder Peabody's engagement letter, dated June 19, 1986, was signed, not by the Chairman of the Special Committee, but by Mr. Rowan. Ten minutes of the meeting were spent discussing the Committee's responsibilities to the shareholders. No written documents were presented.

The Special Committee's evaluation of management's leveraged buyout proposal was thereafter performed through four "meetings" over the next five days. The first three "meetings" were by telephone and were simply updates during which the committee was advised of the status of negotiations toward the management buyout. The fourth was held when the entire board was flown to New York and the leveraged buyout was approved by both the Special Committee and the board. At no time did the Committee attempt to negotiate the terms of the transaction directly with Merrill Lynch or give Kidder Peabody any specific instructions regarding negotiation of the terms of the proposed transac-

tion. Nor was the Special Committee ever informed that Merrill Lynch had been willing apparently to pay $50.00 per share or that Kidder Peabody had evaluated the stock values in excess of that figure. The Committee relied solely on Kidder Peabody and management to negotiate on behalf of the shareholders. The testimony of the members of the Committee is that they lacked the expertise to interfere with negotiation of the transaction. The Committee, in short, deferred entirely to the judgment of management and its management-selected advisers.

The Special Committee's passivity and the superficiality of its review are clearly demonstrated by its failure:

A. to negotiate, observe negotiations or to suggest that management seek an all-cash transaction, or to consider the possible benefits of any transaction other than the one proposed by management despite the obvious inequities to shareholders of this transaction, particularly to those who would be left as shareholders in a new corporation subordinate to management shareholders;[1]

B. to either ask for or determine a range of value for the company;

C. to determine how management was going to obtain either the $100 million in corporate funds it had committed to purchase the company's shares, or the $10 million which management itself had agreed to commit—or indeed which members of management would be committed.

D. to request any written evaluation or analysis prior to making its recommendation of either the management proposal, or of comparative values of the Edelman Group and management proposals to the shareholders;

---

1. The management tender offer was limited to 75–77% of the outstanding stock with the remainder to be exchanged for a unit of securities allegedly worth $48.50 per share. The coercion of such a "front-end," two-tiered offer on stockholders is well documented. *See,* e.g., *Unocal*

*Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985); *Two-Tier Tender Offer Pricing and Non-Tender Offer Purchase Programs—Advance Notice of Possible Commission Action,* Exchange Act Release No. 1079, June 21, 1984, Fed.Sec.L. Rep. (CCH), ¶ 83,637 (1984).

E. to attempt to negotiate out the "no-shop" provision;[2]

F. to determine the value of the company before or after the merger, or the value of management's share of that company, as opposed to the shares of those shareholders excluded from the management cash tender offer;

G. to determine what divisions or other corporate assets it would be necessary to sell following the merger and the amount of the financing that management would be forced to raise through such sales;

H. to attempt to negotiate equal voting rights for the public shareholders who after the merger would receive a class of stock with one vote per share while management received a class of stock with three votes per share;

I. and finally, to contact Mr. Edelman either to discuss his $44.00 proposal or the possibility of his making a higher offer until the late evening of June 24th, midway through the meeting in New York, when calls were allegedly made to his apartment before a final recommendation was made to the entire board.

At no time prior to the very day that management's proposal was adopted did the Special Committee receive any written materials to study concerning the proposed leveraged buyout. The Committee's final meeting on June 24th was the first time it was presented with any documents and those documents (which were explained to, but not read by the Committee members at that time) were the final drafts of that transaction. No written fairness opinion was among the materials presented to the Committee. The Committee and the entire board had been flown to the New York attorneys' office to meet explicitly so that all necessary papers could be executed at the meeting.

The deposition testimony is consistent that the Committee's review was done in a hurried, last-minute atmosphere to meet the needs of management. The Committee members did not understand the proposal's financing arrangements, which had been merely "highlighted" to them. They all acknowledged that time was of the essence because the Edelman Group's tender offer would succeed and Edelman would buy the company if nothing was done on behalf of management to stop him. Although the role of the Committee was ostensibly to evaluate both the Edelman Group's offer and the management-sponsored proposal, no representative of the Edelman Group was ever invited to attend or to communicate with it despite Edelman's reiteration of his request for an opportunity to negotiate by a hand-delivered letter on June 18th. The only objection to the Edelman Group's offer which the Committee has explained is the fact that he had not "put his money on the table." Neither however, had management. The Special Committee unanimously determined to recommend management's leveraged buyout to the full board, and did so immediately after being advised of the highlights of the transaction on the evening of June 24th.

A meeting of the full board then commenced. After the transaction was explained, the chairman of the Special Committee recommended the leveraged buyout. The board was presented for the first time with a draft merger agreement with Merrill Lynch but had no documents evaluating the fairness of either the management plan or the Edelman Group's offer. Following twenty minutes of discussion from which the self-interested management members were not excused, the leveraged buyout was unanimously approved and the Edelman Group's offer was rejected by the board.

At the same meeting, the board was presented for the first time, and unanimously approved, resolutions pursuant to which the company's stock option plan was amended to require acceleration of all options should someone purchase 40% of the company in a hostile transaction; the incentive compensation plan was amended so that all unpaid installments of awards to employee participants in the plan became due if 40% of the company were acquired in

---

**2.** "No-shop" provision and its effect explained *infra.*

a hostile transaction; and the retirement plan was amended to preclude an acquirer not approved by the board from having access to the $70 to $100 million over-funded portion of the plan. Those funds were, however, left available for use in the management buyout. The board also passed a resolution exempting the transaction from the operation of Chapter 7A of the Michigan Business Corporation Act, M.C.L.A. § 450.1101 *et seq.* The acknowledged effect of all of these amendments was to make it impossible for an outside bidder to compete on even terms with management bidders. The company was made vastly more expensive to any outsider and less valuable simultaneously to its shareholders.

On June 25th, management announced that it had entered into a merger agreement with LMC Holdings, Inc., (LMC) a new subsidiary of Merrill Lynch and LMC Acquisition Corporation (LMC Acquisition), a newly-formed subsidiary of LMC. The agreement provided that Fruehauf would be acquired by LMC and that certain members of management would personally acquire between 20 and 60 percent of the equity in LMC. The agreement obliged management and LMC Acquisition to commence a partial joint tender offer at $48.50 per share for approximately 75–77 percent of Fruehauf's outstanding common stock. Management itself would contribute $10 million to the buyout and the company would pay $100 million to repurchase 2,000,000 of its own shares. The only financial commitments acquired by management of which the court had been apprised prior to the hearing were those made or paid for by the corporation. The $1 billion debt by which the management offer would be financed was short-term, falling due at the time of the merger. No refinancing of the debt had been put in place as of the hearing date.

Any stockholder beyond the first 75–77 percent or who had not tendered his or her shares by July 25th would be compelled to exchange those shares for a right to receive a unit of securities consisting of 1.738 shares of $3.56 cumulative exchangeable redeemable preferred stock with a liquidation value of $25.00 per share, and one share of Class B common stock of LMC. Kidder Peabody opined that those shares would be worth $48.50. The Class B securities would have one-third the voting power of the Class A common stock which management and Merrill Lynch would hold.

In addition to the $100 million of the company's funds which apparently would be used to purchase its own shares, Fruehauf management would also pay over $30 million of the company's money to Merrill Lynch and others in financing and advisory fees in connection with the transaction. In the event that another bidder succeeded in gaining control of the company, Merrill Lynch nevertheless would receive a $10 million fee and Manufacturers Hanover would receive $3 million of Fruehauf's funds in consideration for the lost transaction. In addition, management entered into a "no-shop" provision at the insistence of Merrill Lynch which promised that any other offer could only be negotiated to the extent required by fiduciary duty—obviously meaning on a *pro forma* basis if it meant anything.

Immediately upon learning of this offer, and the day before the management offer was mailed to the shareholders, the Edelman Group offered to structure a merger similar to the management-led leveraged buyout on a negotiated basis for a price of $49.50 per share. Alternatively, the Edelman Group proposed a tender offer for all outstanding shares of Fruehauf common stock at $49.50 per share. Both proposals were conditioned upon endorsement by Fruehauf's board and the Edelman Group obtaining financing of which it remained confident.

The Edelman Group's offer was considered during a telephone conversation among the members of the Special Committee, representatives of Kidder Peabody and Shearman & Sterling. The Special Committee took the position that it would not meet with Mr. Edelman unless he evidence firm financial commitments for the entire

transaction, or to quote some of its members, unless he "put his money on the table." Again, that requirement had never been made of management. Mr. Edelman's offer was rejected by the Committee on July 1st.

Fruehauf now seeks a preliminary and permanent injunction against the Edelman Group to prohibit pursuit of its tender offer, alleging irreparable harm to the shareholders as a result of violations of §§ 13(d), 14(d) and 14(e) of the Securities Exchange Act of 1934. The Edelman Group has requested that the management-sponsored LMC tender offer and merger agreement be enjoined because it constitutes a breach of the Fruehauf directors' fiduciary duties. The Steiner plaintiffs, who claim to represent the approximately 23,000 holders of the corporation's common stock, seek to enjoin the LMC offer on grounds substantially similar to those alleged by the Edelman Group.

To obtain a preliminary injunction, the party seeking that injunction must demonstrate:

1. a strong or substantial likelihood or probability of success on the merits

2. irreparable injury to the plaintiff pending adjudication on the merits absent the injunction

3. that the balance of hardship falls heaviest upon the plaintiff

4. that the public interest would be served by issuing the preliminary injunction.

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

■ In Case No. 86–71483, *Fruehauf Corporation, et al. v. Asher Edelman, et al.,* the court must deny plaintiff's motion for a preliminary injunction. First, plaintiffs have failed to demonstrate a substantial likelihood of success on the merits. Fruehauf asserts two grounds on which the court should prohibit the Edelman Group from proceeding with its offer. Fruehauf claims that the Edelman Group's offer is speculative, a sham, and merely represents an attempt to manipulate the market for Fruehauf's shares. In addition, Fruehauf alleges that the documents which the Edelman Group has filed with the Securities and Exchange Commission fail to disclose required financial information.

The court finds no persuasive evidence that the Edelman Group has misrepresented its purpose in acquiring shares of Fruehauf stock, making its offers to purchase, or in its filings. If Edelman simply hoped to sell his shares at a price higher than that at which he purchased them, he could have done so at numerous points in the history of these events and would not have continued to pursue this transaction. At present, he has the highest offer outstanding.

Plaintiffs' claim that the Edelman Group's offer is illusory is discredited by the evidence. Not only does the testimony of Mr. Edelman and his financial advisers confirm his intention and ability to bring his proposals to fruition, but the testimony of plaintiffs' own witnesses indicates that Fruehauf management was informed by its financial advisers on June 11th that the Edelman Group's $44.00 tender offer would succeed if left unhampered.

Plaintiffs' allegation is further belied by its actions or the actions of its principals. If Fruehauf management truly believed that the $44.00 offer was illusory, its own hastily arranged leveraged buyout proposal and the defensive measures taken to protect it would have been unnecessary. There is absolutely no evidence that the Edelman Group would have been unable to obtain financing for any of its proposals, or that it would not proceed to do so. Nor does the fact that an offer is contingent upon obtaining financing under these circumstances render it illusory. There is no requirement that the funding of such an offer must be in hand. *Warnaco, Inc. v. Galef,* Civil No. B–86–146 (transcript of Op. April 3, 1986 D.Conn.). Management's own proposal was not fully funded even at the time of the hearing.

■ Plaintiffs' claim that the Edelman Group has failed to disclose all relevant financial information is equally unsup-

ported. Sections 13(d) and 14(d) do not require disclosure of the specific, detailed financial information regarding the natural person, who happens to be chairman of Datapoint, which plaintiffs seek.[3] The Edelman Group's Schedule 14(d)–1 and Offer to Purchase both comply with Rule 14(d) by disclosing selected financial information for Datapoint, the entity controlling the bidder. These disclosures provide sufficient information from which the shareholders may determine whether the offer is in their interest or not.

The Fruehauf plaintiffs have also failed to meet their burden of showing irreparable harm to the Fruehauf shareholders if the Edelman Group's tender offer is continued. To the contrary, the court finds that the shareholders will be irreparably harmed if defendants' offer is *not* continued and any possibility of such harm to the shareholders will be averted by the relief which the court has afforded, elsewhere in this order.

The court having found no harm whatsoever to the Fruehauf shareholders if the Edelman Group's offer is continued, it is axiomatic that the balance of hardship does not tip in plaintiffs' favor, nor does the public interest require the enjoining of defendants' offer. Therefore, plaintiffs' motion is denied.

■ In case No. 86–72915, *William Steiner, et al. v. Fruehauf Corporation, et al.*, the court must also deny the motion for preliminary injunction. It does not appear at this point that there is a substantial likelihood and probability that this action will be maintainable as a class action, there having been no showing whatsoever that the named plaintiffs will and can fairly and adequately protect the interests of the class they purport to represent as required by Federal Rule of Civil Procedure 23(a)(4).[4] Indeed, the court cannot state that there is a probability now that the Fruehauf shareholders would constitute one single class under the circumstances. Because the relief being afforded on the basis of the clearer showing of the Edelman Group here prevents the irreparable harm claimed in this case, the motion is denied.

■ In case No. 86–71332, *Plaza Securities Co., et al. v. Fruehauf Corp., et al.*, the court will enjoin defendants' LMC tender offer and merger. All criteria for such relief have been met.

The law is essentially undisputed and all of the parties have argued from the same set of cases. In Michigan, corporate directors owe the fiduciary duties of care and loyalty to the corporation and to the shareholders. *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1319 (W.D.Mich.1978); *Thomas v. Satfield Co.*, 363 Mich. 111, 108 N.W.2d 907 (1961). These duties require that the directors act in good faith and with the degree of diligence, care and skill on behalf of those who have entrusted them which an ordinarily prudent and loyal person would exercise under similar circum-

---

3. Under Item 9 of Rule 14D–100, information regarding the financial condition of a tender offer bidder must be disclosed. When the bidder is formed for the purpose of making a tender offer and it is controlled by another entity, "adequate financial information regarding such parent" must be disclosed. *Id.* The instructions to Item 9 state:

the following types of financial information will be deemed adequate for purposes of this item for the type of bidder specified: (a) financial statements prepared in compliance with Form 10 as amended ... for a domestic bidder which is otherwise eligible to use such form.

*Id.; see* Securities Act Release No. 5844, 1977–78 Fed.Sec., L.Rep. (CCH) ¶ 81,256 at 81256 (July 27, 1977). Where the parent entity is eligible to use Form 10, no further disclosure is required. The Edelman Group's Schedule 14D–1 and Offer to Purchase both comply with Rule 14D–100 by disclosing selected financial information for Datapoint, a corporation eligible to use Form 10. Datapoint is the parent entity of the general partner of FH Partners, which in turn owns 100% of the bidder, FH Acquisition. Thus, financial data of the entity controlling the bidder has been supplied and no further disclosure is required.

4. "The burden of showing the satisfaction of all four of the prerequisites of Rule 23(a) falls on the party seeking to utilize the class action device." *In re Consumers Power Co. Securities Litigation*, 105 F.R.D. 583,600 (E.D.Mich.1985).

stances in a like position. Mich.Bus.Corp. Act., M.C.L.A. 450.1541(1).

■ In a contest for corporate control, when directors have determined that it is inevitable that the corporation be sold, as occurred here on June 11th, the directors' cardinal fiduciary obligation to the corporation and its shareholders is to ensure "maximization of the company's value at a sale for the stockholders' benefit." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del.1986).[5] *See also Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985); *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264 (2d Cir. 1986); *Dynamics Corp. v. CTS Corp.,* [current] Fed.Sec.L.Rep. (CCH) ¶ 92,768 (7th Cir.1986). Under these circumstances, the directors must act as a fair and neutral auctioneer.

Fruehauf's board has not only breached its duty to determine, seek and obtain maximum values for its shareholders, but in its haste to save and protect the company for management, at the best possible price for management, the board has created a record on which, even to this day there is no clear indication as to which of the three offers now pending is, all told, the best value for the shareholders. By simultaneously, willy-nilly approving the management leveraged buyout, erecting barriers to alternative offers, and refusing to negotiate two offers from the Edelman Group, either of which at $44.00 or at $49.50 per share may well have been superior to management's, all of the Fruehauf directors have unquestionably breached their fiduciary duties of loyalty and care. By permitting management to use more than $120 million of the company's assets, and by amending the company's pension plan to permit only management to use the $70 to $100 million over-funded portion of the plan to fund its proposed transaction, the directors have allowed assets to be used in a discriminatory fashion to facilitate management's self-dealing and unfair auction. By failing to thoroughly review management's proposed self-interested transaction in an unbiased fashion, without preconceived notions as to the necessity of the transaction, the Fruehauf directors have failed to exercise business judgment and have breached their duty of care. None of these actions on management's part may be protected by the business judgment rule.[6]

■ As to disclosure, because the management leveraged buyout involved a joint tender offer designed to make Fruehauf a privately held company, the disclosures made in connection with that transaction must comply with the Securities and Exchange Commission's standards set forth in Rule 13e–3, 17 C.F.R. § 240.13e–3 and Schedule 13e–3, 17 C.F.R. § 240.13e–

---

5. In the absence of Michigan law concerning a question of corporate law, the courts of Michigan have referred to Delaware law. *See, e.g., Russ v. Federal Mogul Corporation,* 112 Mich. App. 449, 316 N.W.2d 454, 457 n. 1 (1982).

6. While the business judgment rule normally accords the directors a presumption that they acted "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984), no such presumption exists in this case. "[T]he business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue.... Once self-dealing or bad faith is demonstrated, the duty of loyalty supersedes the duty of care, and the burden shifts to the directors to 'prove that the transaction was fair and reasonable to the corporation.'" *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 265 (2d Cir.1984) quoting *Treadway*

*Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980). Accordingly, the burden was on the directors in this case to demonstrate "good faith and reasonable investigation," and that the defensive mechanism enacted was "reasonable in relation to the threat posed." *Moran v. Household International, Inc.,* 500 A.2d 1346, 1356 (Del.1985); *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985).

Similarly, the Michigan Business Corporation Act, Mich.Comp.Laws §§ 450.1545, 450.1546, provides that the burden of defending a transaction in which the board is interested falls on the directors. The board may defend such a transaction by showing that it was fair and reasonable, or by showing that it acted with particular sensitivity and care in approving the transaction. Clearly, the Fruehauf directors have failed to meet their burden in this case.

100.[7] Because the material facts concerning the leveraged buyout are exclusively within the possession of Fruehauf management, because management's interests are in conflict with those of the shareholders, because the offer is for only part of Fruehauf's outstanding shares, with 23–25% of the present shares subordinated to the management shareholders of a new corporation, judicial review of disclosures and nondisclosures must be especially rigorous. *Blanchette v. Providence & Worcester Co.,* 428 F.Supp. 347, 354 (D.Del.1977); *Pavlidis v. New England Patriots Football Club, Inc.,* 737 F.2d 1227, 1231 (1st Cir.1984); 1 Lipton & Steinberger, *Takeovers & Freezeouts* § 3.01[5].

Management has failed to meet the disclosure requirements of the S.E.C. Rules because its tender offer materials:

A. falsely described the role and the independence of the Special Committee and ignore the conflicts of interest of the Committee's legal and financial advisers, assuring the shareholders of a fairness that did not exist;

B. failed to disclose that management's $48.50 proposal was lower than the value of the company as suggested by its advisers, and lower than the original proposal which was suggested by Merrill Lynch;

C. failed to disclose any of the relevant financial data used by management in preparing its leveraged buyout;

D. failed to disclose the self-serving purpose and the effect on shareholders of the June 24th amendments of the stock option, employee incentive and retirement plans; and

E. failed to adequately describe management's alleged evaluation and investigation of the Edelman Group's offer and its consideration of alternatives.

Although it is difficult to ascertain and compare the relative value to the shareholders of the transactions which are now proposed, this difficulty itself is a result of the board's own failure to ever conduct a meaningful inquiry into the effects of the management proposal and to compare the value of the management buyout to the value of the Edelman Group's offer either at $44.00 or at $49.50 per share.

The objections to Edelman, as expressed in deposition by the board members, were that he might not be able to pay for the shares tendered and that he may thereafter sell off divisions of the corporation. As to the first objection, it has been laid to rest by these same depositions. All directors knew on June 11th that Edelman would succeed in acquiring the company at $44.00 per share if nothing extraordinary intervened. As to the second objection, the directors all knew that management itself would have to sell divisions of the company after completion of their own leveraged buyout. They also knew that management would use the over-funded pension fund and other vast sums of corporate funds as described above, to accomplish their own ownership of the company. On June 11th, the Fruehauf board realized that some transactions which would transform the company as they knew it had become inevitable. Rather than make diligent efforts to obtain maximum value for the shareholders by conducting a fair auction from that point on, the directors acted only to save management in approving the management leveraged buyout.

If defendants are not enjoined from proceeding with this tender offer and merger preliminarily, it is clear to the court that it

---

7. These regulations were designed to protect shareholders' interests in "going private" transactions such as management's proposed leveraged buyout in this case, where the potential for overreaching inherently exists due to the unequal bargaining power and access to information of the shareholders not affiliated with the controlling interests of the corporation. *See generally,* S.E.C. Release No. 34–17719, 17 C.F.R. § 241.17719.

Among other things, the issuer must describe the purpose of the contemplated transaction, the alternatives considered, reasons for the transaction's structure, and must justify the fairness of the transaction, including exposure of the various factors it considered and discussion of how such factors were considered. *See* Items 7 & 8, Schedule 13e–3, 17 C.F.R. § 240.13e–100.

will be unable to construct a remedy for either the Edelman plaintiffs or for the shareholder plaintiffs at the conclusion of litigation in which they are highly likely to prevail. The complexities of the several transactions in progress and the synergistic effects of each on the other will produce truly irreparable damages. Whatever results current events will produce, they will become irreversible and cannot be unscrambled in any way by this court. Damages would not suffice if indeed they could be calculated. Shareholders who are coerced by the current state of affairs into tendering their shares, as well as those who do not, cannot be made whole by any ascertainable formula.

The corporate defendants, on the other hand, will suffer no irreparable harm from the order which the court intends to enter, and the public interest is served by the enforcement of the settled law of fiduciaries and full disclosure in securities transactions. Defendants will still be free to pursue their transaction, but they must do so on an even and illuminated playing field.

IT IS THE ORDER OF THE COURT that:

I. The Fruehauf defendants ("defendants") and those acting in concert with them are enjoined from conducting, furthering, pursuing or concluding the LMC tender offer of June 27, 1986 (the "offer"), except as herein ordered by this Court. This injunction precludes specifically, but without limitation: receiving, accepting for payment or paying for any shares tendered in connection with that offer except as ordered.

II. Defendants are ordered to extend the offer, if further pursued, at least until Friday, August 29, 1986, and to extend withdrawal rights under that offer at least until Friday, August 22, 1986. Notice of this extension is to be made forthwith by whatever means is appropriate by law and custom for such notices to be given. This order to extend the offer is made in light of the stipulation on the record by counsel for the Edelman group that the Edelman group will extend its $44 per share cash tender offer at least until Friday, August 29, 1986 as well.

III. Defendants are further ordered within 7 days of July 24, 1986, to disseminate to Fruehauf shareholders a corrected offer to purchase which fully discloses the following facts not previously disclosed which the Court finds material and necessary to render other statements made by defendants not misleading. All required findings are to be amended to make such disclosures as well.

A. All relevant financial data as to the value of the corporation and the securities held by its present shareholders before and after the transactions proposed by LMC and Fruehauf and approved by the Fruehauf Board of Directors.

B. A full description of the extent and the limitations of the activities of the Special Committee and of its legal and financial advisers, including any activities reflecting conflicts of interest on the part of any person or entity.

C. The fact that management's $48.50 proposal is lower than the value of the Company suggested by management's adviser, Kidder Peabody, and lower than the original proposal of Merrill Lynch but was the highest offer which management wished to make to its shareholders, and that the Special Committee was not so advised nor was it advised as to any valuation of the Company.

D. A full description of management's and the Special Committee's alleged investigations of the Edelman offer, the facts revealed by that investigation, and the extent of their negotiation or consideration of that offer or any other alternatives.

IV. Defendants and all those in concert with them are enjoined from using, devoting or committing to use any corporate assets in support of the LMC tender offer and merger agreement, including specifically but without limitation, the payment or commitment to pay fees of any type or the use of corporate funds or assets to pay for shares acquired or to be acquired by them in connection therewith, or making funds

available to management for its use, or for payment of legal and investment advisers for the individual defendants in connection with any future transactions between defendants and the corporation or its shareholders, unless the same accommodation is made to all other bidders, until further order.

V. Defendants are further enjoined to rescind and this Court declares invalid the purported June 24th amendments of Fruehauf's stock option, employee incentive and retirement plans which this court finds have the effect explicitly intended by defendants of facilitating management's purchase of the corporation from the shareholders at the lowest possible cost to management while diminishing the corporation's value, diminishing the values realizeable to shareholders, and of making a purchase by any less-favored bidder far more expensive.

If during pendency of these motions defendants have already rescinded all of those actions as is represented here, they are ordered not to reinstate them.

VI. Defendants are further enjoined to rescind their purported acts, in breach of their fiduciary duty to their shareholders, to exempt the LMC merger offer and agreement under the provisions of Chapter 7A of the Michigan Business Corporation Act.

VII. Finally, defendants are enjoined from any further breaches of their fiduciary duties to Fruehauf shareholders whatsoever, whether described herein or not. They are ordered to be governed solely and strictly by their duty to determine, seek and obtain maximum value for the shareholders in all matters touching upon the subjects of these lawsuits.

In accordance with that duty, they are ordered to negotiate forthwith and in good faith with plaintiffs or any other potential offers towards any transaction for the enhancement of shareholder values which may be presented.

IT IS FURTHER ORDERED that no bond is necessary or appropriate.